MARIO N. ALIOTO, ESQ. (56433)
JOSEPH M. PATANE, ESQ. (72202)
LAUREN C. CAPURRO, ESQ. (241151)
**TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP**
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

*Lead Counsel for Indirect Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| BRIAN LUSCHER; SIMON LEE; JEFFREY FIGONE; STEVEN GANZ; LAWYER'S CHOICE SUITES, INC.; DAVID ROOKS; SANDRA RIEBOW; TRAVIS BURAU; SOUTHERN OFFICE SUPPLY, INC.; KERRY LEE HALL; PATRICK CARLEO, JR.; LISA REYNOLDS; DAVID NORBY; BARRY KUSHNER; SUZANNE COTTER; KATHRYN GUMM; RICHARD JONES; STEVEN FINK; GREGORY PAINTER; JOHN MURPHY; MARY ANN STEPHENSON; JANET ACKERMAN; LOUISE WOOD; PATRICIA ANDREWS; GARY HANSON; ANGELA GARDINIER; CHRISTINE LONGO; CHRIS CARRINGTON; DONNA MARIE ELLINGSON; ALEXANDER M. NICHOLSON, JR.; RICHARD SHEW; MARGARET SLAGLE; JOHN LARCH; AND BRIGID TERRY, individually and on behalf of a Class of all those similarly situated in their respective States, | MDL No. 1917<br>Master File No: 4:07-cv-5944<br>Case No. 4:17-cv-04067-JST<br><br>**INDIRECT PURCHASER PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT AGAINST MITSUBISHI ELECTRIC CORPORATION**<br><br>**JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| vs. | |
| MITSUBISHI ELECTRIC CORPORATION, Defendant. | |

1

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................... 1

II. JURISDICTION AND VENUE ................................................................................ 3

III. DEFINITIONS ...................................................................................................... 5

IV. PLAINTIFFS ......................................................................................................... 6

V. DEFENDANT ....................................................................................................... 10

VI. AGENTS AND CO-CONSPIRATORS ............................................................... 10

VII. FACTUAL ALLEGATIONS ............................................................................. 27

   A.    CRT Technology ............................................................................................ 27

   B.    Structural Characteristics Of The CRT Market ............................................. 28

      a.   Market Concentration ................................................................................. 28

      b.   Information Sharing ................................................................................... 28

      c.   Consolidation ............................................................................................. 29

      d.   Multiple Interrelated Business Relationships ........................................... 29

      e.   High Costs Of Entry Into The Industry .................................................... 30

      f.   The Maturity Of The CRT Market ........................................................... 31

      g.   Homogeneity Of CRTs .............................................................................. 32

   C.    Pre-Conspiracy Market ................................................................................. 32

   D.    Defendant's And Co-Conspirators' Illegal Agreements ................................ 32

      a.   "Glass Meetings" ....................................................................................... 33

      b.   Bilateral Discussions ................................................................................. 36

      c.   Defendant's And Co-Conspirators' Participation In Group And Bilateral Discussions 38

   E.    The CRT Market During The Conspiracy ..................................................... 44

   F.    International Government Antitrust Investigations ........................................ 47

VIII. THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS .................. 50

IX. CLASS ACTION ALLEGATIONS ..................................................................... 54

i

X. VIOLATIONS ALLEGED ....................................................................................... 58

    A.     First Claim for Relief: Violation of State Antitrust Statutes .......................... 58

    B.     Second Claim for Relief: Violation of State Consumer Protection and Unfair

    Competition Statutes ..................................................................................... 77

XI. FRAUDULENT CONCEALMENT ................................................................... 103

XII. TOLLING .......................................................................................................... 105

XIII. PRAYER FOR RELIEF ..................................................................................... 105

XIV. JURY DEMAND ................................................................................................ 106

**INDIRECT PURCHASER PLAINTIFFS' CLASS ACTION COMPLAINT AGAINST MITSUBISHI ELECTRIC**

Plaintiffs Brian Luscher, Simon Lee, Jeffrey Figone, Steven Ganz, Lawyer's Choice Suites, Inc., David Rooks, Sandra Riebow, Travis Burau, Southern Office Supply, Inc., Kerry Lee Hall, Patrick Carleo, Jr., Lisa Reynolds, David Norby, Barry Kushner, Suzanne Cotter, Kathryn Gumm, Richard Jones, Steven Fink, Gregory Painter, John Murphy, Mary Ann Stephenson, Janet Ackerman, Louise Wood, Patricia Andrews, Gary Hanson, Angela Gardinier, Christine Longo, Chris Carrington, Donna Marie Ellingson, Alexander M. Nicholson, Jr., Richard Shew, Margaret Slagle, John Larch, and Brigid Terry ("Plaintiffs"), individually and on behalf of all those similarly situated in each of the states identified herein, bring this action for damages under state antitrust laws, unfair competition and consumer protection laws, against the Defendant named herein, demanding trial by jury, and complaining and alleging as follows:

## I. INTRODUCTION

1.        Plaintiffs bring this antitrust class action on behalf of individuals and entities in Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin that indirectly purchased Cathode Ray Tubes ("CRTs") (as further defined below) from Defendant, its predecessors, any subsidiaries or affiliates thereof, or any of its named and unnamed co-conspirators, during the period beginning  March 1, 1995 until November 25, 2007 (the "Class Period").  Plaintiffs allege that during the Class Period the Defendant conspired to fix, raise, maintain and/or stabilize prices of CRTs sold in the United States, including the 31 states identified above.  Because of Defendant's unlawful conduct, Plaintiffs and other Class Members paid artificially inflated prices for products containing CRTs ("CRT Products") and have suffered antitrust injury to their business or property.

2.        As further detailed below, beginning in at least 1995, Defendant's co-conspirators, including Samsung, Philips, Daewoo, LG and Chunghwa, met or communicated with other co-conspirators in order to discuss and agree upon CRT prices and the amount of CRTs each would produce.  Over time, these co-conspirators reached out to other co-

1

conspirators, including Defendant and Toshiba, Panasonic, Hitachi, BMCC, IRICO, Thomson (now known as Technicolor), Thai CRT, and Samtel, who then also met or talked with their competitors for the purpose of fixing the prices of CRTs. By 1997, a formal system of multilateral and bilateral meetings was in place, involving the highest levels of the co-conspirator corporations, all with the sole purpose of fixing the prices of CRTs at supracompetitive levels.

3.      Throughout the Class Period, Defendant's and co-conspirators' conspiracy was effective in moderating the normal downward pressure on prices for CRTs caused by periods of oversupply and competition from new technologies, such as TFT-LCD and Plasma. Defendant's and co-conspirators' conspiracy resulted in unusually stable pricing and even rising prices in a very mature, declining market. As a result of Defendant's and co-conspirators' unlawful conduct, Plaintiffs and Class members paid higher prices for CRT Products than they would have paid in a competitive market.

4.      This global conspiracy has been investigated by the Antitrust Division of the United States Department of Justice ("DOJ"), and by several other international competition authorities. The publicly available information did not indicate that the initial government investigations had targeted Defendant. The DOJ investigation resulted in a guilty plea by Samsung SDI Co., Ltd. for violations of the Sherman Act, 15 U.S.C. § 1, and a $32 million fine, as well as the indictments of three former Chunghwa Picture Tubes, Ltd., executives, one former Samsung SDI executive, and two former LG Philips Displays executives, all for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.      Defendant participated, continued to participate in, and did not effectively withdraw from, the conspiracy. Because Defendant joined a continuing conspiracy, it is responsible not only for its own acts but also all acts of its co-conspirators during the Class Period, as detailed herein.

6.      This case concerns the same conspiracy and many of the same transactions and events alleged in *In re Cathode Ray Tube (CRT) Antitrust Litig.,* MDL No. 1917 (Master File No. 3:07-cv-05944).

# II. JURISDICTION AND VENUE

7.     This action is instituted to recover damages under state antitrust, unfair competition, and consumer protection laws, and to recover costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of the Defendant's violations of those laws.

8.     This court has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of Plaintiffs is a citizen of a state different from any Defendant and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs." This Court also has jurisdiction under 28 U.S.C. § 1332(d) because "one or more members of the class is a citizen of a state within the United States and one or more of the Defendants is a citizen or subject of a foreign state," as well as 28 U.S.C. § 1367 because all claims at issue are part of the same case or controversy and arise from the same operative facts.

9.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 (b), (c) and (d), because a defendant not resident in the United States may be sued in any judicial district, a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

10.     This Court has personal jurisdiction over Defendant pursuant to California Code of Civil Procedure Section 410.10. Defendant conducts business throughout the United States, including this jurisdiction, and has purposefully availed itself of the laws of the United States, including specifically the laws of the state of California. Defendant and its subsidiaries sold CRTs and CRT Products in the state of California and each of the states identified herein. Defendant's intentional actions were expressly aimed at California and the states identified herein, and its activities had a direct, substantial and intended effect on commerce in the state of California and each of the states at issue.

3

11.     Defendant had significant contacts with the United States and specifically the state of California during the Class Period.

12.     Defendant's two U.S. subsidiaries (Mitsubishi Electric U.S., Inc., f/k/a Mitsubishi Electric & Electronics USA, Inc., and Mitsubishi Electric Visual Solutions America, Inc. were headquartered in California, and were sales and marketing agents for Defendant's CRTs and CRT Products in the United States.  These subsidiaries marketed, promoted, sold and distributed substantial quantities of Defendant's CRTs and CRT Products to customers in the state of California and throughout the United States, including each of the states identified herein.

13.     Defendant directed the sales and marketing activities of its U.S. subsidiaries, and was involved in planning and purchasing discussions with CRT customers in the state of California and in each of the states identified herein.  Defendant derived substantial revenue from the marketing and sale of CRTs and CRT Products in California and each of the states identified herein.

14.     Defendant also sold substantial quantities of CRTs and CRT Products directly to various customers located in California during the Class Period.

15.     Defendant also engaged in production and pricing discussions relating to the manufacture of CRTs in its plants in Mexico and Canada, which Defendant knew were destined for sale to the U.S. market.  Under the North American Free Trade Agreement ("NAFTA"), Mexico became one of the world's largest assemblers of CRT Products, the overwhelming majority of which were produced for the U.S. market.

16.     Defendant purposefully availed itself of the United States market for CRTs and CRT Products, and the laws of the state of California and each of the states identified herein.

17.     Defendant purposefully directed its unlawful activities at the state of California and each of the states identified herein in that it fixed prices and constrained competition on CRTs sold to customers in California and each of the states identified herein.

18.     As a direct, substantial and intended result of Defendant's and its co-conspirators' unlawful conspiracy to fix the prices of CRTs, prices of CRT Products sold to

4

indirect purchaser consumers in the state of California and each of the states identified herein were higher than they would have been in the absence of the conspiracy. As a result, Defendant caused damage to purchasers of CRT Products in the state of California and each of the states identified herein.

19. The conspiracy described herein adversely affected every person nationwide, and more particularly, consumers in each of the states identified in this Complaint, who indirectly purchased Defendant's and its co-conspirators' CRTs. Defendant's conspiracy has resulted in an adverse monetary effect on indirect purchasers in each state identified herein.

20. Prices of CRT Products in each state identified in this Complaint were raised to supracompetitive levels by the Defendant and its co-conspirators. Defendant knew and intended that commerce in CRTs and CRT Products in each of the states identified herein would be adversely affecting by implementing the conspiracy.

## III. DEFINITIONS

21. As used herein, the term "CRT" or "CRTs" stands for "cathode ray tube(s)." A CRT is a display technology used in televisions, computer monitors and other specialized applications. The CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors. An electron gun at the back of the vacuum tube emits electron beams. When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light. A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors. This process is rapidly repeated several times per second to produce the desired images.

22. There are two types of CRTs: color display tubes ("CDTs") which are used in computer monitors and other specialized applications; and color picture tubes ("CPTs") which are used in televisions. CDTs and CPTs are collectively referred to herein as "cathode ray tubes" or "CRTs."

23. "CRT Products" means products containing CRTs, such as television sets and computer monitors.

24.     The "Class Period" or "relevant period" means the period beginning March 1, 1995 through November 25, 2007.

25.     "Person" means any individual, partnership, corporation, association, or other business or legal entity.

26.     "OEM" means any Original Equipment Manufacturer of CRT Products.

## IV. **PLAINTIFFS**

27.     Plaintiff Brian Luscher is an **Arizona** resident.  During the relevant period, Mr. Luscher indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

28.     Plaintiff Simon Lee is an **Arkansas** resident.  During the relevant period, Mr. Lee indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

29.     Plaintiff Jeffrey Figone is a **California** resident.  During the relevant period, Mr. Figone indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

30.     Plaintiff Steven Ganz is a **California** resident.  During the relevant period, Mr. Ganz indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

31.     Plaintiff Lawyers' Choice Suites, Inc. ("Law Suites") is a corporation doing business in the **District of Columbia**.  During the relevant period, Law Suites indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

32.     Plaintiff David Rooks is a **Florida** resident.  During the relevant period, Mr. Rooks indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

33.     Plaintiff Sandra Riebow is a **Hawaii** resident.  During the relevant period, Ms. Riebow indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint

6

34. Plaintiff Travis Burau is an **Iowa** resident. During the relevant period, Mr. Burau indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

35. Plaintiff Southern Office Supply, Inc. is a **Kansas** corporation. During the relevant period, Southern Office Supply, Inc. indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

36. Plaintiff Kerry Lee Hall is a **Maine** resident. During the relevant period, Ms. Hall indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

37. Plaintiff Patrick Carleo, Jr. is a **Massachusetts** resident. During the relevant period, Mr. Carleo indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

38. Plaintiff Lisa Reynolds is a **Michigan** resident. During the relevant period, Ms. Reynolds indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

39. Plaintiff David Norby is a **Minnesota** resident. During the relevant period, Mr. Norby indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

40. Plaintiff Barry Kushner is a **Minnesota** resident. During the relevant period, Mr. Kushner indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

41. Plaintiff Suzanne Cotter is a **Mississippi** resident. During the relevant period, Ms. Cotter indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

42. Plaintiff Kathryn Gumm is a **Missouri** resident. During the relevant period, Ms. Gumm indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

7

43. Plaintiff Richard Jones is a **Montana** resident. During the relevant period, Mr. Jones indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

44. Plaintiff Steven Fink is a **Nebraska** resident. During the relevant period, Mr. Fink indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

45. Plaintiff Gregory Painter is a **Nevada** resident. During the relevant period, Mr. Painter indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

46. Plaintiff John Murphy is a **New Hampshire** resident. During the relevant period, Mr. Murphy indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

47. Plaintiff Mary Ann Stephenson is a **New Mexico** resident. During the relevant period, Ms. Stephenson indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

48. Plaintiff Janet Ackerman is a **New York** resident. During the relevant period, Ms. Ackerman indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

49. Plaintiff Louise Wood is a **New York** resident. During the relevant period, Ms. Wood indirectly purchased CRTs from Defendant or one or more of its co-conspirators and had been injured by reason of the antitrust violations alleged in this Complaint.

50. Plaintiff Patricia Andrews is a **North Carolina** resident. During the relevant period, Ms. Andrews indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

51. Plaintiff Gary Hanson is a **North Dakota** resident. During the relevant period, Mr. Hanson indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

8

52. Plaintiff Angela Gardinier is an **Oregon** resident. During the relevant period, Ms. Gardinier indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

53. Plaintiff Christine Longo is a **Rhode Island** resident. During the relevant period, Ms. Longo indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

54. Plaintiff Chris Carrington is a **South Carolina** resident. During the relevant period, Ms. Carrington indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

55. Plaintiff Donna Marie Ellingson is a **South Dakota** resident. During the relevant period, Ms. Ellingson indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

56. Plaintiff Alexander M. Nicholson, Jr. is a **Tennessee** resident. During the relevant period, Mr. Nicholson indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

57. Plaintiff Richard Shew is a **Utah** resident. During the relevant period, Mr. Shew indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

58. Plaintiff Margaret Slagle is a **Vermont** resident. During the relevant period, Ms. Slagle indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

59. Plaintiff John Larch is a **West Virginia** resident. During the relevant period, Mr. Larch indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

60. Plaintiff Brigid Terry is a **Wisconsin** resident. During the relevant period, Ms. Terry indirectly purchased CRTs from Defendant or one or more of its co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

9

## V. <u>DEFENDANT</u>

61.     Defendant Mitsubishi Electric Corporation ("**Mitsubishi Electric**") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan. Mitsubishi Electric and its subsidiaries manufactured CRTs in factories located in Japan, Mexico and Canada for sale to customers in the state of California and throughout the United States.  Mitsubishi Electric sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the state of California, throughout the U.S. and elsewhere.  Mitsubishi Electric's television and monitor division also purchased CRTs from other CRT manufacturers.  Mitsubishi Electric also sold its CRTs to customers outside the United States with knowledge that those customers would use their CRTs to manufacture monitors for U.S. OEMs.  During the Class Period, Mitsubishi Electric manufactured, marketed, sold and distributed CRTs and CRT Products in the United States both directly through direct sales to customers in the United States, and indirectly through its United States subsidiaries and affiliates.

## VI.  <u>AGENTS AND CO-CONSPIRATORS</u>

**<u>Chunghwa Entities</u>**

62.     Chunghwa Picture Tubes Ltd. ("**CPT**") is a Taiwanese company with its principal place of business located at 1127 Heping Road, Bade City, Taoyuan, Taiwan.  CPT was founded in 1971 by Tatung Company.  Throughout the majority of the Class Period, Tatung Company owned a substantial share in CPT.  Although Tatung Company's holdings in CPT have fallen over time, it retained substantial control over CPT's operations.  The Chairman of CPT, Weishan Lin, was also the Chairman and General Manager of Tatung Company.  CPT was a leading manufacturer of CRTs.  During the Class Period, CPT manufactured, marketed, sold and/or distributed CRTs, both directly and through its wholly-owned and controlled subsidiaries in Malaysia, China, and Scotland, to customers throughout the United States.

63.     Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("**Chunghwa Malaysia**") is a Malaysian company with its principal place of business located at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  Chunghwa

Malaysia is a wholly-owned and controlled subsidiary of Chunghwa Picture Tubes.  Chunghwa
Malaysia was a leading worldwide supplier of CRTs.  During the Class Period, Chunghwa
Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly
through its subsidiaries or affiliates, to customers throughout the United States.   CPT dominated
and controlled the finances, policies, and affairs of Chunghwa Malaysia relating to the antitrust
violations alleged in this Complaint.

   64. CPT and Chunghwa Malaysia are collectively referred to herein as "**Chunghwa**."

  **Daewoo/Orion Entities**

   65. During the Class Period, Orion Electric Company ("**Orion**") was a major
manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In
1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was
involved in CRT sales and manufacturing joint ventures and had subsidiaries all over the world,
including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are
informed and believe that Orion was wholly owned by the "**Daewoo Group**."  The Daewoo
Group included Daewoo Electronics Company, Ltd., Daewoo Telecom Company, Daewoo
Corporation, and Orion Electric Components Company.  The Daewoo Group was dismantled in
or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity
called Daewoo-Orion Société Anonyme ("**DOSA**") in France.  As of approximately 1996,
DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around
2004.  In December 1995, Orion partnered with Toshiba Corporation and two other entities to
form P.T. Tosummit Electronic Devices Indonesia ("**TEDI**") in Indonesia.  TEDI was projected
to have an annual production capacity of 2.3 million CRTs by 1999.  During the Class Period,
Orion, Daewoo Electronics, TEDI and DOSA manufactured, marketed, sold and/or distributed
CRTs and CRT Products, either directly or indirectly through their subsidiaries or affiliates, to
customers throughout the United States.

   66. Daewoo Electronics, Orion, and DOSA are collectively referred to herein as
"**Daewoo**."

  **Hitachi Entities**

67. **Hitachi, Ltd**. is a Japanese company with its principal place of business located at 6-1 Marunouchi Center Building 13F, Chiyoda-ku, Tokyo 100-8280, Japan. Hitachi Ltd. is the parent company for the Hitachi brand of CRTs. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Class Period, Hitachi Ltd. manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

68. Hitachi Displays, Ltd. ("**Hitachi Displays**") is a Japanese company with its principal place of business located at AKS Building, 3 Kandaneribeicho 3, Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays, Ltd. was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays, Ltd. During the Class Period, Hitachi Displays, Ltd. manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Displays relating to the antitrust violations alleged in this Complaint.

69. Hitachi Electronic Devices (USA), Inc. ("**HEDUS**") is a Delaware corporation with its principal place of business located at 1000 Hurricane Shoals Road, Ste. D-100, Lawrenceville, GA 30043. HEDUS is a subsidiary of Hitachi Displays and Hitachi, Ltd. During the Class Period, HEDUS manufactured, marketed, sold and/or distributed CRTs to customers, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of HEDUS relating to the antitrust violations alleged in this Complaint.

70. Hitachi America, Ltd. ("**Hitachi America**") is a New York company with its principal place of business located at 50 Prospect Ave., Tarrytown NY 10591. Hitachi America is a wholly-owned and controlled subsidiary of Hitachi, Ltd. During the Class Period, Hitachi America sold and/or distributed CRTs and CRT Products, either directly or indirectly through its

12

subsidiaries or affiliates, to customers throughout the United States. Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi America relating to the antitrust violations alleged in this Complaint.

71. Hitachi Asia, Ltd. ("**Hitachi Asia**") is a Singapore company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly owned and controlled subsidiary of Hitachi, Ltd. During the Class Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

72. Shenzhen SEG Hitachi Color Display Devices, Ltd. ("**Hitachi Shenzhen**") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at least a 25% interest in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Class Period. During the Class Period, Hitachi Shenzhen manufactured, sold and distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

73. Hitachi Ltd., Hitachi Displays, Hitachi America, HEDUS, Hitachi Asia, and Hitachi Shenzhen are collectively referred to herein as "**Hitachi**."

**IRICO Entities**

74. IRICO Group Corporation ("**IGC**") is a Chinese corporation with its principal place of business located at No. 11 Xinxi Road, Shangdi, Haidian District, Beijing. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, sale and/or

distribution of CRTs.  During the Class Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

75.　　IRICO Display Devices Co., Ltd. ("**IDDC**") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of IGC.  In 2006, IDDC was China's top CRT maker.  During the Class Period, IDDC manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

76.　　IRICO Group Electronics Co., Ltd. ("**IGE**") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.  IGE is owned by IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Its website also claims that in 2003, it was the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit and taxation.  During the Class Period, IGE manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

77. IGC, IDDC, and IGE are collectively referred to herein as "IRICO."

**LG Electronics Entities**

78.　　**LG Electronics, Inc.** is a corporation organized under the laws of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea.  LG Electronics, Inc. is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from GoldStar Communications to LG Electronics, Inc. in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LG Electronics, Inc. transferred its CRT business to a 50/50 CRT joint

venture with Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. forming LG.Philips Displays. During the Class Period, LG Electronics, Inc. manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

79. LG Electronics U.S.A., Inc. ("**LGEUSA**") is a Delaware corporation with its principal place of business located at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632. LG Electronics USA, Inc. is a wholly-owned and controlled subsidiary of LG Electronics, Inc. During the class period, LG Electronics U.S.A., Inc. manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. LG Electronics, Inc. dominated and controlled the finances, policies, and affairs of LGEUSA relating to the antitrust violations alleged in this Complaint.

80. LG Electronics, Inc. and LGEUSA are collectively referred to herein as "**LG**."

**LP Displays**

81. LP Displays International, Ltd. f/k/a LG.Philips Displays ("**LP Displays**") was originally created in 2001 as a 50/50 joint venture between LG Electronics, Inc. and Royal Philips Electronics of The Netherlands. In March 2007, LP Displays became an independent company organized under the laws of Hong Kong with its principal place of business located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. LP Displays was a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion, and a market share of 27%. LP Displays announced in March 2007 that Royal Philips and LG Electronics would cede control over the company and the shares would be owned by financial institutions and private equity firms. During the Class Period, LP Displays manufactured, marketed, sold and distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Panasonic Entities**

82. **Panasonic Corporation**, which was at all times during the Class Period known as Matsushita Electric Industrial Co., Ltd. and only became Panasonic Corporation on October 1, 2008, is a Japanese entity with its principal place of business located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. In 2002, Panasonic Corporation entered into a CRT joint venture with Toshiba forming MT Picture Display Co., Ltd. ("**MTPD**"). Panasonic Corporation was the majority owner with 64.5 percent. On April 3, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making MTPD a wholly-owned subsidiary of Panasonic Corporation. In 2005, the Panasonic brand had the highest CRT Product revenue in Japan. During the Class Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

83. Panasonic Corporation of North America ("**Panasonic NA**") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094. Panasonic NA is a wholly owned and controlled subsidiary of Panasonic Corporation. During the Class Period, Panasonic NA manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Panasonic Corporation dominated and controlled the finances, policies, and affairs of Panasonic NA relating to the antitrust violations alleged in this Complaint.

84. Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("**Matsushita Malaysia**") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam, Malaysia 40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to its CRT joint venture with Toshiba Corporation, MTPD in 2003. It was re-named as MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly-owned subsidiary of MTMPD until its closure in 2006. During the Class Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

16

States. Panasonic Corporation dominated and controlled the finances, policies, and affairs of Matsushita Malaysia relating to the antitrust violations alleged in this Complaint.

85. Panasonic Corporation, Panasonic NA and Matsushita Malaysia are collectively referred to herein as "**Panasonic**."

86. MT Picture Display Co., Ltd. ("**MTPD**") was established as a CRT joint venture between Panasonic and Toshiba. MTPD is a Japanese entity with its principal place of business located at1-15 Matsuo-cho, Kadoma-shi, Osaka 571-8504, Japan. On April 3, 2007, Panasonic Corporation purchased the remaining stake in MTPD, making it a wholly-owned subsidiary, and renaming it MT Picture Display Co., Ltd. During the Class Period, MTPD manufactured, sold and distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

87. Beijing-Matsushita Color CRT Company, Ltd. ("**BMCC**") is a Chinese company with its principal place of business located at No. 9, Jiuxianqiao N. Rd., Dashanzi Chaoyang District, Beijing, China. BMCC was a joint venture company, 50% of which was held by MTPD. The other 50% was held by Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a China state-owned enterprise), and Beijing Yayunchun Branch of the Industrial and Commercial Bank of China, Ltd. (a China state-owned enterprise). Formed in 1987, BMCC was Matsushita's (n/k/a Panasonic) first CRT manufacturing facility in China. BMCC was the second largest producer of CRTs in China. During the Class Period, BMCC manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Philips Entities**

88. Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. ("**Royal Philips**") is a Dutch company with its principal place of business located at Amstelplein 2, Breitner Center, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 160,900 employees located in over 60 countries. Royal Philips had sole ownership of its CRT business until 2001. In 2001,

17

Royal Philips transferred its CRT business to a 50/50 CRT joint venture with LG Electronics, Inc. forming LG.Philips Displays (n/k/a LP Displays International, Ltd.). During the Class Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

89. Philips Electronics North America Corporation ("**PENAC**") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, NY 10020-1104. Philips Electronics NA is a wholly owned and controlled subsidiary of Royal Philips. During the Class Period, Philips Electronics NA manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Royal Philips dominated and controlled the finances, policies, and affairs of PENAC relating to the antitrust violations alleged in this Complaint.

90. Philips Electronics Industries (Taiwan), Ltd. ("**Philips Taiwan**") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of Royal Philips. During the Class Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Royal Philips dominated and controlled the finances, policies, and affairs of Philips Taiwan relating to the antitrust violations alleged in this Complaint.

91. Philips da Amazonia Industria Electronica Ltda. ("**Philips Brazil**") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned subsidiary of Royal Philips. During the Class Period, Philips Brazil manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Royal Philips dominated and controlled the finances, policies, and affairs of Philips Brazil relating to the antitrust violations alleged in this Complaint.

92.     Royal Philips, PENAC, Philips Taiwan and Philips Brazil are collectively referred to herein as "**Philips**."

**Samsung Entities**

93.     Samsung SDI Co., Ltd. f/k/a Samsung Display Device Co., Ltd. ("**Samsung SDI**") is a South Korean company with its principal place of business located at 4285 Gongse-dong, Giheung-gu Yongin 446577, South Korea. Samsung SDI is a public company. Samsung Electronics Co., Ltd. is a major shareholder holding almost 20 percent of the stock. Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy businesses, with 28,000 employees and facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than another other producer. Samsung SDI has offices in Chicago and San Diego. During the Class Period, Samsung SDI manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

94.     Samsung SDI America, Inc. ("**Samsung SDI America**") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California. Samsung SDI America is a wholly-owned and controlled subsidiary of Samsung SDI. During the Class Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI America relating to the antitrust violations alleged in this Complaint.

95.     Samsung SDI Mexico S.A. de C.V. ("**Samsung SDI Mexico**") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of Samsung SDI. During the Class Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRTs to customers, either directly or indirectly through its subsidiaries or affiliates, throughout the United States. Samsung SDI dominated

19

and controlled the finances, policies, and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this Complaint.

96.    Samsung SDI Brasil Ltda. ("**Samsung SDI Brazil**") is a Brazilian company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary of Samsung SDI.  During the Class Period, Samsung SDI Brazil manufactured, marketed, sold and/or distributed CRTs to customers, either directly or indirectly through its subsidiaries or affiliates, throughout the United States.   Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Brazil relating to the antitrust violations alleged in this Complaint.

97.    Shenzhen Samsung SDI Co., Ltd. ("**Samsung SDI Shenzhen**") is a Chinese company with its principal place of business located at 5003 Huanggang Bei Lu, Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of Samsung SDI.  During the Class Period, Samsung SDI Shenzhen manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this Complaint.

98.    Tianjin Samsung SDI Co., Ltd. ("**Samsung SDI Tianjin**") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of Samsung SDI.  During the Class Period, Samsung SDI Tianjin manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this Complaint.

99.    Samsung SDI (Malaysia) Sdn. Bhd. ("**Samsung SDI Malaysia**") is a Malaysian company with its principal place of business located at Lot 635 & 660, Kawasan Perindustrian,

Tuanku, Jaafar, 71450 Sungai Gadut, Negeri Semblian Darul Khusus, Malaysia. Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of Samsung SDI Co., Ltd. During the Class Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

100. Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia are referred to collectively herein as "**Samsung**."

**Samtel**

101. Samtel Color, Ltd. ("**Samtel**") is an Indian company with its principal place of business located at 501, Copia Corporate Suites, District Centre, Jasola, New Delhi 110025. Samtel's market share for CRTs sold in India is approximately 40%. Samtel was India's largest exporter of CRTs. Samtel gained safety approvals from the United States, Canada, Germany and Great Britain for its CRTs. During the Class Period, Samtel manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Thai CRT**

102. Thai CRT Company, Ltd. ("**Thai CRT**") was a Thai company with its principal place of business located at 1/F Siam Cement Road, Bangsue Dusit, Bangkok, Thailand. Thai CRT was a subsidiary of Siam Cement Group. It was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Class Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Thomson Entities**

103. Technicolor SA (f/k/a Thomson SA) ("**Thomson SA**")is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, through its wholly-owned subsidiary Thomson Consumer Electronics

21

Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson SA's television division also purchased CRTs from other CRT manufacturers. Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.

104. In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation. The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson"). TCL took a 67 percent stake in the joint venture, with Thomson SA holding the rest of the shares. As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.

105. In 2005, Thomson SA sold its CRT business to Videocon. At the same time, it invested €240 million in Videocon, including a €225 million investment in Videocon and a €15 million investment in Videocon International. Thomson SA also acquired a 13.1% interest in Videocon. Under its agreement with Videocon, Thomson management would help Videocon run the CRT business during the transition period and beyond. Videocon and Thomson also agreed on Preferred Supplier Agreements for Thomson's display components business. Thomson SA obtained at least one seat on Videocon's board of directors. Thomson SA maintained at least a 10% ownership interest in Videocon for the rest of the Class Period. Thomson SA changed its name to Technicolor SA in January 2010. During the Class Period, many Thomson SA executives served as executives or board members of Thomson Consumer Electronics.

106. During the Class Period, Thomson SA manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

107. Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("**Thomson Consumer Electronics**"), is a U.S. corporation with its principal place of business located at

22

10330 N Meridian St., Indianapolis, IN 46290-1024. Thomson Consumer Electronics is a wholly-owned subsidiary of Thomson SA. Thomson SA sold Thomson Consumer Electronics' CRT business to Videocon in 2005. Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania, Marion, Indiana and Mexicali, Mexico. The United States-based plants were closed in 2004. Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. Thomson's CRT televisions were sold in the United States to United States consumers under the RCA brand.

108. Thomson Consumer Electronics' parent sold its television business to TCL-Thomson in 2003, and sold the CRT business to Videocon in 2005.

109. During the Class Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

110. Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "**Thomson**."

**Technologies Displays**

111. Technologies Displays Americas LLC ("TDA") (formerly Thomson Displays Americas LLC) is a Delaware limited liability company with its principal place of business located at 1778 Carr Road Suite 4B, Calexico, California 92231. Thomson Displays Americas LLC was a wholly-owned subsidiary of Thomson Consumer Electronics. It was one of the Thomson subsidiaries purchased by Videocon as alleged herein. It is a wholly-owned subsidiary of Videocon and is now owned by Eagle Corp., Ltd., which became a wholly-owned subsidiary of Videocon on December 31, 2005 after Videocon acquired the balance 81% equity stake in Eagle Corp., Ltd. Eagle Corp. acquired TDA in September 2005. TDA was originally formed with governing members represented equally from Thomson and Videocon. TDA is the parent corporation of Technologies Displays Mexicana, a Mexican corporation which manufactured CRTs and sold the CRTs to TDA for sale and distribution in the United States.

Thomson, and then defendant Videocon, dominated and/or controlled the finances, policies, and/or affairs of TDA relating to the antitrust violations alleged herein.  TDA referred to itself as a "Thomson" business even after Videocon's acquisition.  During the Class Period, TDA marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Toshiba Entities**

112.      **Toshiba Corporation** is a Japanese corporation with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, Toshiba Corporation held a 5-10 % worldwide market share for CRTs used in televisions and computer monitors.  In December 1995, Toshiba Corporation partnered with Orion Electric Company (n/k/a Daewoo Electronics Corporation) and two other entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, Toshiba Corporation entered into a joint venture with Panasonic Corporation called MT Picture Display Co., Ltd. in which the entities consolidated their CRT businesses.  During the Class Period, Toshiba Corporation manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

113.      Toshiba America Consumer Products, LLC ("**TACP**") is headquartered in 82 Totawa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly owned and controlled subsidiary of Toshiba Corporation through Toshiba America.  During the Class Period, TACP sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Toshiba Corporation dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust violations alleged in this Complaint.

114.      Toshiba America Information Systems, Inc. ("**TAIS**") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92718.  TAIS is a wholly owned and controlled subsidiary of Toshiba Corporation through Toshiba America, Inc.  During the Class Period, TAIS manufactured, marketed, sold and/or distributed CRT

Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Toshiba Corporation dominated and controlled the finances, policies, and affairs of TAIS relating to the antitrust violations alleged in this Complaint.

115. Toshiba America Electronics Components, Inc. ("**TAEC**") is a California corporation with its principal place of business located at 9775 Toledo Way, Irvine, California 92618, and 19000 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a wholly owned and controlled subsidiary of Toshiba America, Inc., which is a holding company for Toshiba Corporation. TAEC was the North American sales and marketing representative for MT Picture Display Co., Ltd. ("MTPD"). Before MTPD's formation in 2003, TAEC was the North American engineering, manufacturing, marketing and sales arm of Toshiba Corporation for CRTs. During the Class Period, TAEC manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Toshiba Corporation dominated and controlled the finances, policies, and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

116. Toshiba Display Devices (Thailand) Company, Ltd. ("**TDDT**") was a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled subsidiary of Toshiba Corporation. Toshiba Corporation transferred Toshiba Thailand to its CRT joint venture with Panasonic Corporation, MTPD, in 2003. It was re-named as MT Picture Display (Thailand) Co., Ltd. and operated as a wholly-owned subsidiary of MTPD until its closure in 2007. During the Class Period, TDDT manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Toshiba Corporation dominated and controlled the finances, policies, and affairs of TDDT relating to the antitrust violations alleged in this Complaint.

117. P.T. Tosummit Electronic Devices Indonesia ("**TEDI**") was a CRT joint venture formed by Toshiba Corporation, Orion Electric Company and two other entities in December 1995. TEDI's principal place of business was located in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to

25

MTPD and its name was changed to PT.MT Picture Display Indonesia.  During the Class Period, TEDI manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Toshiba Corporation dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this Complaint.

118.　　Toshiba Corporation, TACP, TAIS, TAEC, TDDT and TEDI are referred to collectively herein as "**Toshiba**."

**Videocon**

119.　　Videocon Industries Limited ("**Videocon**") is an Indian corporation with its principal place of business located at Aurangabad Paithan Road 14, KM Stone, Chitegaon, Tq. Paithan, Dist. Aurangabad - 431105, India.  In or about June 2005, Videocon acquired the CRT businesses of Thomson SA, a French corporation, and its wholly-owned subsidiary Thomson Consumer Electronics, Inc., a U.S. corporation, which included CRT manufacturing subsidiaries in Poland, Italy, Mexico, and China.  Videocon acquired the businesses, including Thomson Displays Americas LLC and Thomson Display Mexicana S.A. de CV, through its wholly-owned investment entity located in the Cayman Islands, Eagle Corporation Limited.  Videocon manufactured its CRTs for the United States market in Thomson's former CRT plants in Mexicali, Mexico, and in China.  Videocon sold these CRTs primarily to the joint venture TCL-Thomson Electronics Corporation, a joint venture that had been formed by Thomson SA and TCL Corporation, a Chinese company ("TCL-Thomson").  TCL-Thomson manufactured CRT televisions for the U.S. market in Juarez, Mexico and in China, and sold them under the RCA brand.  During the Class Period, Videocon manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

120.　　All of the above-listed co-conspirators are collectively referred to herein as "co-conspirators."

121.　　Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or

transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

122.    Defendant also is liable for acts done in furtherance of the alleged conspiracy by companies it acquired through mergers or acquisitions.

123.    Defendant and each of the co-conspirators acted as the agent or joint venturer of or for the other co-conspirators and the Defendant with respect to the acts, violations and common course of conduct alleged herein.  Each Defendant or co-conspirator which is a subsidiary of a foreign parent acts as the sole United States agent for CRTs and CRT Products made by its parent company.

## VII. FACTUAL ALLEGATIONS

### A.    CRT Technology

124.    CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  It was not until the RCA Corporation introduced the product at the 1939 World's Fair, however, that it became widely available to consumers.  Since then, CRTs have become the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.  Even large public displays, including many scoreboards at sports arenas, are comprised of thousands of single-color CRTs.

125.    As noted above, the CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors.  An electron gun at the back of the vacuum tube emits electron beams.  When the electron beams strike the phosphors, the phosphors produce either red, green, or blue light.  A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors.  This process is rapidly repeated several times per second to produce the desired images.

126.    The quality of a CRT display is dictated by the quality of the CRT itself.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole product such that the product is often simply referred to as "the CRT."

27

127.    Until the last few years, CRTs were the dominant technology used in displays, including television and computer monitors. During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

**B.    Structural Characteristics Of The CRT Market**

128.    The structural characteristics of the CRT market are conducive to the type of collusive activity alleged in this Complaint. These characteristics include market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, maturity of the CRT market, and homogeneity of products.

**a.    Market Concentration**

129.    During the Class Period, the CRT industry was dominated by relatively few companies. In 2004, Samsung SDI, LG.Philips Displays (n/k/a LP Displays), MT Picture Display and Chunghwa together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination since there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**b.    Information Sharing**

130.    Because of common membership in trade associations for the CRT market and related markets (for e.g., TFT-LCD), interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendant to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages. Defendant and co-conspirators took advantage of these opportunities to discuss and agree upon their pricing for CRTs.

131.    Mitsubishi Electric was a member of the Japanese Electronic Industries Association of Japan. Chunghwa, Hitachi and Samsung were all members of the Society for Information Display. Samsung and LG Electronics, Inc. were two of the co-founders of the Korea Display Industry Association. Similarly, Daewoo, LG Electronics, LP Displays, and

Samsung were members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendant and co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendant and co-conspirators exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### c.   Consolidation

132.   The CRT industry also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LG.Philips Displays (n/k/a LP Displays) in 2001 as a joint venture between Royal Philips and LG Electronics, Inc.; and (b) the 2002 merger of Toshiba and Matsushita/Panasonic's CRT business into MTPD.

133.   Defendant and co-conspirators also consolidated their manufacturing facilities in lower cost venues such as China and reduced manufacturing capacity to prop up prices.

### d.   Multiple Interrelated Business Relationships

134.   The CRT industry had a close-knit nature whereby multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity to collude.  These business relationships also created a unity of interest among competitors so that the conspiracy was easier to implement and enforce than if such interrelationships did not exist.

135.   Examples of the high degree of cooperation among co-conspirators in both the CRT market and other closely related markets include the following:

    a.   The formation of the CRT joint venture LG.Philips Displays in 2001 by LG Electronics, Inc. and Royal Philips.

    b.   LG Electronics, Inc. and Royal Philips also formed LG.Philips LCD Co., Ltd., n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

    c.   The formation of the CRT joint venture MTPD in 2003 by Toshiba and Panasonic.

d. Toshiba and Panasonic also formed Toshiba-Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e. In December 1995, Daewoo and Toshiba partnered with two other entities to form TEDI which manufactured CRTs in Indonesia.

f. Daewoo and Toshiba also signed a cooperative agreement relating to LCDs in 1995. Pursuant to the agreement, Daewoo produced STN LCDs, and Toshiba, which had substituted its STN LCD production with TFT LCD production, marketed Daewoo's STN LCDs globally through its network.

g. Also in 1995, Chunghwa entered into a technology transfer agreement with Toshiba for large CPTs.

h. Chunghwa had a joint venture with Samsung Electronics Co., Ltd. for the production of liquid crystal display panels. Chunghwa licensed the technology from Royal Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

i. LG Electronics, Inc. and Hitachi Ltd. entered into a joint venture in 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

j. Samtel participated in a joint venture, Samcor Glass Limited, with Samsung Electronics Co., Ltd. and Corning Inc., USA for the production and supply of picture tube glass.

136. Samtel claims to have supplied CRTs to LG Electronics, Inc., Samsung, Royal Philips, and Panasonic.

**e.   High Costs Of Entry Into The Industry**

137. There were substantial barriers to entry in the CRT industry. It would require substantial time, resources and industry knowledge to even potentially overcome the barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs and CRT Products.

30

**f.**     **The Maturity Of The CRT Market**

138.     Newer industries are typically characterized by rapid growth, innovation and high profits. The CRT market was a mature one, and like many mature industries, was characterized by slim profit margins, creating a motivation to collude.

139.     Demand for CRTs and CRT Products was declining throughout the Class Period. Static or declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

140.     In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and Plasma displays. This was one of the factors which led Defendant and co-conspirators to engage in this alleged price fixing scheme in order to slow down declining CRT prices. Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

141.     Although demand was declining as a result of the popularity of flat-panel LCD/plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Class Period, making Defendant's and co-conspirators' collusion and the international price fixing conspiracy worthwhile. Due to the high costs of LCD panels and plasma displays during the Class Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

142.     In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America. By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

143.     As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share. CRT televisions continued to dominate the global television market, accounting for 75 percent of worldwide TV units in 2006.

### g. Homogeneity Of CRTs

144. CRTs were commodity-like products which were manufactured in standardized sizes. A Defendant's or co-conspirator's CRTs for a particular application, such as a particular size television set or computer monitor, were substitutable for another's. Defendant and its co-conspirators sold and Plaintiffs (and Class members) purchased CRTs and CRT Products primarily on the basis of price.

145. It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

### C. Pre-Conspiracy Market

146. The genesis of the CRT conspiracy was in the late 1980s as the CRT business became more international and the co-conspirators began serving customers that were also being served by other international companies. During this period, the employees of co-conspirators would encounter employees from their competitors when visiting their customers. A culture of cooperation developed over the years and employees of Defendant and its co-conspirators would exchange market information on production, capacity, and customers.

147. In the early 1990s, representatives from Samsung, Daewoo, Chunghwa and Orion visited each other's factories in S.E. Asia. During this period, these producers began to include discussions about price in their meetings. The pricing discussions were usually limited, however, to exchanges of the range of prices that each competitor had quoted to specific customers.

### D. Defendant's And Co-Conspirators' Illegal Agreements

148. Plaintiffs are informed and believe, and thereon allege, that in order to maximize revenue and profitability during declining demand for CRTs, Defendant and its co-conspirators engaged in a contract, combination, trust or conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially inflated levels from March 1, 1995 through November 25, 2007.

32

149.     The CRT conspiracy was effectuated through a combination of group and bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and took place on an informal, ad hoc basis.  During this period, representatives from LG, Samsung and Daewoo visited other co-conspirator manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba, and Panasonic to discuss increasing prices for CRTs in general and to specific customers.  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

150.     Samsung, Chunghwa, LG, and Daewoo also attended several ad hoc group meetings during this period.  The participants at these group meetings also discussed increasing prices for CRTs.

151.     As more manufacturers formally entered the conspiracy, group meetings became more prevalent.  In and after 1997, the co-conspirators began to meet in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.  The-conspirators' representatives attended hundreds of these meetings during the Class Period.

152.     The overall CRT conspiracy raised and stabilized worldwide prices (including United States prices) that Defendant charged for CRTs.

**a.     "Glass Meetings"**

153.     The group meetings among the participants in the CRT price-fixing conspiracy were referred to by the participants as "Glass Meetings" or "GSM."  Glass Meetings were attended by employees at three general levels of the Defendant's corporations.

154.     Meetings at the first level were attended by high level company executives including CEOs, Presidents, and Vice Presidents.  These meetings were known as "Top Meetings."  Top Meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at Top Meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at Top Meetings were also able to resolve disputes because they were decision makers who could make agreements.

33

155. Meetings at the second level were attended by the co-conspirators' high level sales managers and were known as "Management Meetings." These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at Top Meetings.

156. Finally, meetings at the third level were known as "Working Level Meetings" and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The Working Level Meetings also tended to be more regional and often took place near the co-conspirators' factories. In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

157. The Chinese Glass Meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent Glass Meeting to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other co-conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

158. Glass Meetings also occurred occasionally in various European countries. Attendees at these meetings included those co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and Thomson.

159. Representatives of the co-conspirators also attended what were known among members of the conspiracy as "Green Meetings." These were meetings held on golf courses.

34

The Green Meetings were generally attended by top and management level employees of the co-conspirators.

160. The agreements reached at the Glass Meetings included:

    a.   agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

    b.   placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

    c.   agreements on pricing for intra-company CRT sales to vertically integrated customers;

    d.   agreements as to what to tell customers about the reason for a price increase;

    e.   agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

    f.   agreements to coordinate pricing with CRT manufacturers in other geographic markets such as Brazil, Europe and India;

    g.   agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers' demands;

    h.   agreements to coordinate uniform public statements regarding available capacity and supply;

    i.   agreements to allocate both overall market shares and share of a particular customer's purchases;

    j.   agreements to allocate customers;

    k.   agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

    l.   agreements to keep their meetings secret.

161. Efforts were made to monitor each co-conspirators adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of the co-conspirators themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other

35

attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition in a mutual interest in living up to the target price and living up to the agreements that had been made.

162. As market conditions worsened in 2005-2007, and the rate of replacement of CRTs by TFT-LCDs increased, the group Glass Meetings became less frequent and bilateral meetings again became more prevalent. In addition, in December 2006 the DOJ issued subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have concerns about antitrust issues.

**b. Bilateral Discussions**

163. Throughout the Class Period, the Glass Meetings were supplemented by bilateral discussions between various co-conspirators. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

164. During the Class Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico and the United States.

165. The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe and the United States.

166. In order to ensure the efficacy of their global conspiracy, the conspirators, including Mitsubishi Electric, Philips, Samsung SDI, Thomson, Toshiba, Panasonic, Hitachi, MTPD, and LPD (from 2001), also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico and the United States. These CRT manufacturers were particularly important because they served the North American market for CRT Products. As further alleged, North America was the largest market for CRT televisions and computer monitors during the Class Period. Because these manufacturers were all wholly-owned and

controlled subsidiaries of Defendant or co-conspirators Philips, Samsung SDI, and LPD, they adhered to the unlawful price-fixing agreements. In this way, Defendant and the co-conspirators ensured that prices of all CRTs sold in or into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

167. Defendant and co-conspirators also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

168. Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendant and co-conspirators Hitachi, Toshiba, Panasonic, Thai CRT, and Samtel. It was often the case that in the few days following a Top or Management Meeting, the attendees at these group meetings would meet bilaterally with these other co-conspirators for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel. Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG, and Thai CRT. Sometimes Hitachi and Toshiba also attended the Glass Meetings. Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi Electric. In this way, Defendant and their co-conspirators participated in the conspiracy to fix prices of CRTs.

### c. Defendant's And Co-Conspirators' Participation In Group And Bilateral Discussions

**Mitsubishi Electric**

169.    Between at least 1995 and 2005, high-level Mitsubishi Electric executives met with their counterparts from various co-conspirators, including Samsung, Toshiba, Chunghwa and Hitachi, on at least 12 occasions.  At these meetings, Mitsubishi Electric discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  Mitsubishi Electric never effectively withdrew from this conspiracy.

170.    Between at least 1995 and 2005, Defendant Mitsubishi Electric also communicated by telephone, email and otherwise with its co-conspirators, including but not limited to Samsung SDI, LG. Philips Displays, Hitachi and Chunghwa, about such matters as CRT prices, production, future production, revenues, volumes, demand, inventory, estimated sales, plant shutdowns, customer allocations, and new product development, and agreed on prices, customer allocations, and supply levels for CRTs.

171.    Plaintiffs have additional evidence of these meetings and communications, but this evidence is designated Highly Confidential pursuant to a protective order in the related multidistrict litigation, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-5944-JST, MDL No. 1917 (N.D. Cal.), pending before the Honorable Jon S. Tigar, and cannot be placed in the public record.  Based in part upon this evidence, Judge Tigar denied Mitsubishi Electric's motion for summary judgment in the *CRT* case.

172.    All of the above acts, as well as others, were in furtherance of the conspiracy.

**Co-Conspirators**

173.    Between at least 1995 and 2007, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin participated in at least 200 Glass Meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with other co-

38

conspirators on a regular basis. Through these discussions, Samsung agreed on prices and supply levels for CRTs.

174. Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them. Thus, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

175. Between at least 1995 and 2001, LG, through LG Electronics, Inc. and LGETT, participated at least 100 Glass Meetings at all levels. After 2001, LG participated in the CRT conspiracy through its joint venture with Philips, LG.Philips Displays (n/k/a LP Displays). A substantial number of these meetings were attended by the highest ranking executives from LG. LG also engaged in bilateral discussions with each of the other co-conspirators on a regular basis. Through these discussions, LG agreed on prices and supply levels for CRTs. LG never effectively withdrew from this conspiracy.

176. LGEUSA was represented at those meetings and was a party to the agreements entered at them. To the extent LGEUSA sold and/or distributed CRTs, it played a significant role in the conspiracy because co-conspirators and Defendant wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

177. Between at least 1996 and 2001, Philips, through Royal Philips and Philips Taiwan, participated at least 100 Glass Meetings at all levels. After 2001, Philips participated in the CRT conspiracy through its joint venture with LG, LG.Philips Displays (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other co-conspirators. Through these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively withdrew from this conspiracy.

178. PENAC and Philips Brazil were represented at those meetings and were a party to the agreements entered at them. To the extent PENAC and Philips Brazil sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because

39

the co-conspirators wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, PENAC and Philips Brazil were active, knowing participants in the alleged conspiracy.

179. Between at least 2001 and 2006, LP Displays (f/k/a LG.Philips Displays) participated at least 100 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from LP Displays. Certain of these high level executives from LP Displays had previously attended meetings on behalf of LG and Philips. LP Displays also engaged in bilateral discussions with other co-conspirators. Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

180. Between at least 1995 and 2006, Chunghwa, through CPT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of CPT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other co-conspirators on a regular basis. Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

181. Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 Glass Meetings at all levels. A substantial number of these meetings were attended by the highest ranking executives from Daewoo. Daewoo also engaged in bilateral discussions with other co-conspirators n a regular basis. Through these discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

182. Between at least 1995 and 2003, Toshiba, through Toshiba Corporation, TDDT and TEDI, participated in several Glass Meetings. After 2003, Toshiba participated in the CRT conspiracy through its joint venture with Panasonic, MTPD. These meetings were attended by high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral discussions with other co-conspirators particularly with LG. Through these discussions,

40

Toshiba agreed on prices and supply levels for CRTs. Toshiba never effectively withdrew from this conspiracy.

183. Toshiba America, Inc., TACP, TAIS and TAEC were represented at those meetings and were a party to the agreements entered at them. To the extent Toshiba America, Inc., TACP, TAIS and TAEC sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because co-conspirators wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Toshiba America, TACP, TAIS, and TAEC were active, knowing participants in the alleged conspiracy.

184. Between at least 1996 and 2001, Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several Glass Meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other co-conspirators particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

185. Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because co-conspirators wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

186. Between at least 1996 and 2003, Panasonic (known throughout the class period as Matsushita Electric Industrial Co., Ltd.), through Panasonic Corporation and Matsushita Malaysia, participated in several Glass Meetings. After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba, MTPD. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other co-conspirators. Through these discussions, Panasonic agreed

on prices and supply levels for CRTs. Panasonic never effectively withdrew from this conspiracy.

187. Panasonic NA was represented at those meetings and was a party to the agreements entered at them. To the extent Panasonic NA sold and/or distributed CRTs to direct purchasers, it played a significant role in the conspiracy because co-conspirators wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Panasonic NA was an active, knowing participant in the alleged conspiracy.

188. Between at least 2003 and 2006, MTPD participated in multiple Glass Meetings and in fact led many of these meetings during the latter years of the conspiracy. These meetings were attended by high level sales managers from MTPD. MTPD also engaged in bilateral discussions with other co-conspirators. Through these discussions, MTPD agreed on prices and supply levels for CRTs.

189. Between at least 1998 and 2007, BMCC participated in multiple Glass Meetings. These meetings were attended by high level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with other co-conspirators, particularly the other Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. BMCC was acting to further its own independent private interests in participating in the alleged conspiracy.

190. Between at least 1998 and 2007, IRICO, through IGC, IGE, and IDDC, participated in multiple Glass Meetings. These meetings were attended by the highest ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other co-conspirators, particularly with other Chinese manufacturers. Through these discussions, IRICO agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in connection with CRTs was mandated by the Chinese government. IRICO was acting to further its own independent private interests in participating in the alleged conspiracy.

42

191. Between at least 1997 and 2006, Thai CRT participated in multiple Glass Meetings. These meetings were attended by the highest ranking executives from Thai CRT. Thai CRT also engaged in multiple bilateral discussions with other co-conspirators, particularly with Samtel. Through these discussions, Thai CRT agreed on prices and supply levels for CRTs. Thai CRT never effectively withdrew from this conspiracy.

192. Between at least 1998 and 2006, Samtel participated in multiple bilateral discussions with other co-conspirators, particularly with Thai CRT. These meetings were attended by high level executives from Samtel. Through these discussions, Samtel agreed on prices and supply levels for CRTs. Samtel never effectively withdrew from this conspiracy.

193. Between at least 1995 and 2005, Thomson SA and Thomson Consumer Electronics participated in at least 61 meetings with its competitors, including several Glass Meetings and multiple bilateral meetings, and "Green Meetings" in the United States, in which unlawful agreements as to price, output restrictions, and/or consumer and market allocation of CRTs occurred. These meetings were attended by Thomson high level sales and operations managers. These meetings attended by Thomson took place in the United States, Europe, Japan, and China, and were also attended by representatives from Samsung SDI, MTPD, LPD, Philips, Toshiba, and Chunghwa. Through all these discussions, Thomson agreed on prices and supply levels for CRTs. Thomson never effectively withdrew from this conspiracy.

194. Thomson SA participated in the conspiracy in its own right and through its subsidiary, Thomson Consumer Electronics, through at least 2005. Thereafter, it participated through its 13% ownership of Videocon following the sale of its CRT business to Videocon in 2005. Thomson never effectively withdrew from the conspiracy.

195. Thomson Consumer Electronics also directly participated in the conspiracy in the United States, which was Thomson's largest market for CRTs. Between 1995 and 2005, Thomson Consumer Electronics knowingly participated in bilateral and group meetings, including "green meetings" in the United States, during which attendants reached unlawful agreements as to price, output restrictions, and/or customer and market allocation of U.S. market CRTs.

196.     Between 2005 and 2007, Defendant Videocon participated in several group meetings and multiple bilateral meetings with competitors, including a number of meetings taking place in China and in Europe in or about July 2005, in the fall of 2005, and in 2006. These meetings were attended by Videocon executives and employees, continuing the practice established by Thomson as alleged above. Through these discussions, Videocon agreed on prices and supply levels for CRTs. Videocon never effectively withdrew from this conspiracy.

197.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by its agents and was party to the agreements reached in them.

**E.     The CRT Market During The Conspiracy**

198.     Until the last few years, CRTs were the dominant technology used in displays, including television and computer monitors. During the Class Period, this translated into the sale of millions of CRTs and CRT Products, generating billions of dollars in annual profits.

199.     The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|--------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

200.     During the Class Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995

44

worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

201. The collusion among Defendant and its co-conspirators is evidenced by unusual price movements in the CRT market during the Class Period. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 p.19. Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

202. In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years…."

203. In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

204. After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

205. A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October….While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

45

206.    A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips, and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be 20% hike in the price of our CRT monitors."

207.    Defendant and its co-conspirators also conspired to limit production of CRTs by shutting down production lines for days at a time, and closing or consolidating their manufacturing facilities.

208.    For example, CRT factory utilization percentage fell from 90 percent in the third quarter of 2000 to 62 percent in the first quarter of 2001.  This is the most dramatic example of a drop in factory utilization.  There were sudden drops throughout the Class Period but to a lesser degree.  Plaintiffs are informed and believe that these sudden, coordinated drops in factory utilization by the Defendant and its co-conspirators were the result of Defendant's and its co-conspirators' agreements to decrease output in order to stabilize the prices of CRT.

209.    During the Class Period, while demand in the United States for CRTs continued to decline, Defendant's and its co-conspirators' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation LCD panels and plasma display products.  As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

210.    During the Class Period, there were not only periods of unnatural and sustained price stability, but there were also increases in prices of CRTs.  These price increases were despite the declining demand due to the approaching obsolescence of CRTs caused by the emergence of a new, potentially superior and clearly more popular, substitutable technology.

211.    These price increases and price stability in the market for CRTs during the Class Period are inconsistent with a competitive market for a product facing rapidly decreasing demand caused by a new, substitutable technology.

46

**F.** **International Government Antitrust Investigations**

212.    Defendant's and co-conspirators' conspiracy to fix, raise, maintain and stabilize the prices of, and restrict output for, CRTs sold in or into the United States during the Class Period, is demonstrated by a multinational investigation commenced by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

213.    Separately, antitrust authorities in Europe, Japan and South Korea raided the offices of manufacturers of CRTs as part of an international investigation of alleged price fixing.

214.    *Kyodo News* reported on November 8, 2007, upon information and belief, that MT Picture Display fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI Co.

215.    *Kyodo News* further reported that:

> Officials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said.

216.    The *Asian Shimbun* further reported on November 10, 2007 that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said.  The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MT Picture Display, Samsung SDI Co., Chunghwa Picture Tubes, LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

217.    On November 21, 2007, Royal Philips publicly disclosed that it too was subject to one or more investigations into anticompetitive conduct in the CRT industry.  Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions started investigations.  Royal Philips stated that it intended to assist the regulators.

218.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings:

Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Picture Tubes (UK), Ltd., Chunghwa Picture Tubes, Ltd., Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany Gmbh, Matsushita Global HQ, Matsushita European HQ.

Based on the data available, the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured picture tubes and coloured screen tubes) on the European market between 1995 and 2007. The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.

According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

219.     In its 2008 Annual Report, Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

220.     On February 10, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had that same day returned a two-count indictment against the former Chairman and Chief Executive Officer of Chunghwa Picture Tubes, Ltd., Cheng Yuan Lin, a/k/a C.Y. Lin, for his participation in global conspiracies to fix the prices of two types of CRTs used in computer monitors and televisions. The press release notes that "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release further notes that Lin had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Lin's indictment states that the

combination and conspiracy to fix the prices of CRTs was carried out, in part, in the Northern District of California.

221. On August 18, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had returned a two-count indictment against Wen Jun Cheng, a/k/a Tony Cheng, a former assistant Vice-President of Sales and Marketing at Chunghwa, for his participation in a global conspiracy to fix the prices of CDTs, used in computer monitors. The press release notes that Cheng had previously been indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in part, in the Northern District of California.

222. On March 30, 2010, Chun-Cheng Yeh, a/k/a Alex Yeh, was indicted by a federal grand jury in the Northern District of California and agreed to plead guilty to conspiring to fix prices, reduce output and allocate market shares of CDTs.

223. On November 9, 2010 three individuals who were current or former employees of Samsung SDI, LG Electronics, and/or LP Display Co. were indicted for their roles in a conspiracy to fix the prices of CDTs. According to the indictment, the combination and conspiracy to fix these prices was carried out, in part, in the Northern District of California.

224. On March 18, 2011, the DOJ issued a press release announcing that it had reached an agreement with co-conspirator Samsung SDI. Samsung SDI pled guilty and paid a $32 million fine for its role in a conspiracy to fix the prices of CDTs. It admitted that from at least January 1997 until at least as late as March 2006, it participated in a conspiracy among major CDT producers to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. Samsung SDI admitted that in furtherance of the conspiracy, it engaged in discussions and attended meetings through its officers and employees with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere. Acts in furtherance of this conspiracy were carried out in the Northern District of California.

49

225.    On December 5, 2012, the European Commission imposed fines totaling €1.47 billion on seven companies for their participation in a CDT and/or CPT cartel.  These companies included: Samsung SDI, Philips, LG Electronics, Thomson, Toshiba, Panasonic, and MTPD. The EC found that these companies participated in cartels "between 1996 and 2006" and that "these companies fixed prices, shared markets, allocated customers between themselves and restricted their output."  The CRT cartels were "textbook cartels featur[ing] all the worst kinds of anticompetitive behavior;" "operated worldwide"; and were "among the most organized cartels that the Commission has investigated."

## VIII.    THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS

226.    Defendant's and its co-conspirators' conspiracy to fix, raise, maintain and stabilize the price of CRTs at artificial levels resulted in harm to Plaintiffs and the indirect purchaser consumer classes alleged herein because it resulted in their paying higher prices for CRT Products than they would have paid in the absence of Defendant's conspiracy.  The entire overcharge at issue was passed on to Plaintiffs and members of the indirect purchaser classes. As the DOJ acknowledged in announcing the indictment of Chunghwa's former Chairman and CEO, "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices."

227.    The conspirators identified above that attended the Glass Meetings, monitored the prices of televisions and computer monitors sold in the U.S. and elsewhere on a regular basis.  The purpose and effect of investigating such retail market data was at least three fold. First, it permitted conspirators such as Chunghwa, which did not manufacture CRT televisions or computer monitors the way that Samsung, LG, Daewoo, Panasonic, Toshiba, Philips, Hitachi, Thomson and Mitsubishi Electric did, to police the price fixing agreement to make sure that intra-defendant CRT sales were kept at supra-competitive levels.  Secondly, it permitted all conspirators to police their price fixing agreement to independent OEMs who would reduce prices for finished goods if there was a corresponding reduction in CRT prices from a co-conspirator.  Finally, as discussed above, conspirators used the prices of finished products to analyze whether they could increase prices or should agree to a "bottom" price instead.  The

50

conspirators concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers (for e.g., retailers and computer OEMs). In this way, the conspirators assured that 100% of the supracompetitive overcharges for CRTs were passed on to indirect purchaser consumers.

228. The indirect purchaser consumers bought CRT Products from either a computer or TV OEM, or a reseller.

229. Because of the breadth of the price-fixing conspiracy here, the direct purchaser CRT TV and monitor manufacturers were not constrained by their competitors from passing on the overcharge. Because each of the direct purchaser's competitors was also buying CRTs at supracompetitive prices from conspiracy members, no direct purchaser faced end-product price competition from a competitor that was not paying supracompetitive prices for CRTs.

230. The price of CRT Products was directly correlated to the price of CRTs. The margins for CRT TV and monitor makers were sufficiently thin that price increases of CRTs force them to increase the prices of their CRT Products. This meant that increases in the price of CRTs led to quick corresponding price increases at the OEM level for CRT Products.

231. Computer and TV OEMs and retailers of CRT Products were all subject to vigorous price competition, whether selling CRT TVs or computer monitors. The demand for CRTs was ultimately determined by purchasers of products containing such products. The market for CRTs and the market for CRT Products were therefore inextricably linked and cannot be considered separately. Defendant and its co-conspirators were well aware of this intimate relationship, and used forecasts of CRT TVs and computer monitors to predict sales of and determine production levels and pricing for CRTs.

232. Computers and televisions are commodities with little or no brand loyalty such that aggressive pricing causes consumers to switch preferences to different brands. Prices are closely based on production costs, which are in turn directly determined by component costs, as assembly costs are minimal. OEMs accordingly used component costs, like the cost of CRTs, as the starting point for all price calculations. On information and belief, computer and TV OEMs

51

priced their end-products on a "cost-plus" basis. Thus, computer and television prices closely tracked increases and decreases in component costs.

233. The CRT was the most expensive component in the products into which they were incorporated. On information and belief, the cost of the CRT in a computer monitor was approximately 60% of the total cost to manufacture the computer monitor. On information and belief, the cost of the CRT in a television was a slightly smaller percentage of the total manufacturing cost because a television had more components than a computer monitor, such as the tuner and speakers.

234. Economic and legal literature recognizes that the more pricing decisions are based on cost, the easier it is to determine the pass-through rate. The directness of affected costs refers to whether an overcharge affects a direct (*i.e.,* variable) cost or an indirect (*i.e.,* overhead) cost. Overcharges will be passed through sooner and at a higher rate if the overcharges affect direct costs. Here, CRTs were a direct and substantial cost of CRT Products. Therefore, Plaintiffs will be able to show that the overcharge on the CRTs was passed through to indirect purchasers.

235. Once a CRT left its place of manufacture, it remained essentially unchanged as it moves through the distribution system. CRTs were identifiable, discreet, physical objects that did not change form or become an indistinguishable part of the TV or computer monitor in which they were contained. Thus, CRTs followed a traceable physical chain from the Defendant to the OEMs to the purchasers of finished products incorporating CRTs.

236. Moreover, just as CRTs could be physically traced through the supply chain, so could their price by traced to show that changes in the prices paid by direct purchasers of CRTs affected prices paid by indirect purchasers of CRT Products. On information and belief, computer and TV OEMs priced their end-products on a "cost-plus" basis.

237. In retailing, it is common to use a "mark-up rule." The retail price is set as the wholesale cost plus a percentage markup designed to recover non-product costs and to provide a profit. This system guarantees that increases in costs to the retailer will be passed on to end buyers. For example, CDW, a large seller of CRT monitors, used such a system. A declaration

52

in the *DRAM* case from CDW's director of pricing details exactly how they calculated selling prices:

> In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product…CDW…adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass through effect of changes in the costs charged to CDW for that product by a given vendor.

238. Economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. As Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624:

> A monopoly charge at the top of the distribution chain generally results in higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and will pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain will be poorer as a result of the monopoly price at the top.

> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

239. Similarly, two other antitrust scholars—Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Hass School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern School of Law and author of the Handbook of the Law of Antitrust)—have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule."

240. As Professor Jeffrey McKie-Mason (Arthur W. Burks Professor for Information and Computer Science, Professor of Economics and Public Policy, and Associate Dean for Academic Affairs in the School of Information at the University of Michigan), an expert who

53

presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in a judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…. Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

241.    The purpose of Defendant's and its co-conspirators' conspiratorial conduct was to fix, raise, maintain and stabilize the price of CRTs and, as a direct and foreseeable result, CRT Products. The market for CRTs and the market for CRT Products were inextricably linked. One existed to serve the other. Defendant and its co-conspirators not only knew, but expressly contemplated that prices of CRT Products would increase as a direct result of their increasing the prices of CRTs.

242.    Finally, many of the Defendant and/or co-conspirators themselves manufactured of CRT TVs and computer monitors. Such manufacturers included, for example, Samsung, LG, Hitachi, Toshiba, Philips, and Panasonic. Having agreed to fix prices for CRTs, the major component of the end products they were manufacturing, these conspirators intended to pass on the full cost of this component in their finished products, and in fact did so.

243.    As a direct and proximate result of Defendant's and its co-conspirators' illegal conduct, Plaintiffs and other indirect purchasers have been forced to pay supra-competitive prices for CRT Products. These inflated prices have been passed on to them by direct purchaser manufacturers, distributors and retailers.

## IX. CLASS ACTION ALLEGATIONS

244.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following classes (collectively "Indirect Purchaser State Classes"): Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana,

Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

245.     The Indirect Purchaser State Classes are defined as follows:

All persons or entities who or which indirectly purchased in an Indirect Purchaser Jurisdiction, other than Missouri, Montana, and Rhode Island, for their own use and not for resale, CRTs or CRT Products manufactured and/or sold by any Mitsubishi Electric Releasee, or any Alleged Co-Conspirator, where such purchase took place during the following time periods:

> From March 1, 1995 through November 25, 2007 for purchases in Arizona, Arkansas, California, District of Columbia, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin;

> From June 25, 2002 through November 25, 2007 for purchases in Hawaii;

> From July 20, 2002 through November 25, 2007 for purchases in Nebraska;

> From February 4, 1999 through November 25, 2007 for purchases in Nevada;

All persons who or which indirectly purchased in Missouri or Montana from March 1, 1995 through November 25, 2007, for their own use and not for resale, and primarily for personal, family or household purposes, CRTs or CRT Products manufactured and/or sold by any Mitsubishi Electric Releasee, or any Alleged Co-Conspirator;

All natural persons who indirectly purchased in Rhode Island from March 1, 1995 through November 25, 2007, for their own use and not for resale, and primarily for personal, family, or household purposes, CRTs or CRT Products manufactured and/or sold by any Mitsubishi Electric Releasee, or any Alleged Co-Conspirator;

Specifically excluded from these Classes are the Defendant; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant. Also excluded are named co-conspirators, any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

**INDIRECT PURCHASER PLAINTIFFS' CLASS ACTION COMPLAINT AGAINST MITSUBISHI ELECTRIC**

246.    This action has been brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

a.   The Classes are ascertainable and there is a well-defined community of interest among members of the Classes;

b.   Based upon the nature of trade and commerce involved and the number of indirect purchasers of CRTs, Plaintiffs believe that the number of Class members is very large, and therefore joinder of all Class members is not practicable;

c.   Plaintiffs' claims are typical of Class members' claims because Plaintiffs indirectly purchased CRTs manufactured by Defendant or its co-conspirators, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Classes and the relief sought is common to the Classes;

d.   The following common questions of law or fact, among others, exist as to the members of the Classes:

    i.   Whether Defendant and one or more co-conspirators formed and operated a combination or conspiracy to fix, raise, maintain, or stabilize the prices of CRTs;

    ii.   Whether the combination or conspiracy caused CRT prices to be higher than they would have been in the absence of Defendant's and the co-conspirators' conduct;

    iii.   The operative time period of Defendant's and co-conspirators' combination or conspiracy;

    iv.   Whether Defendant's conduct caused injury to the business or property of Plaintiffs and the members of the Classes;

    v.   The appropriate measure of the amount of damages suffered by the Classes;

vi.  Whether Defendant's conduct violates the Indirect Purchaser States' antitrust laws as alleged in the First Claim for Relief;

vii.  Whether Defendant's conduct violates the unfair competition and consumer protection laws of the Consumer Protection States as alleged in the Second Claim for Relief; and

e.  These and other questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages;

f.  After determination of the predominant common issues identified above, if necessary or appropriate, the Classes can be divided into logical and manageable subclasses;

g.  Plaintiffs will fairly and adequately protect the interests of the Classes in that Plaintiffs have no interests that are antagonistic to other members of the Classes and have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent them and the Classes; and

h.  A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical.  The damages suffered by the individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Thus, absent the availability of class action procedures it would not be feasible for Class members to redress the wrongs done to them.  Even if the Class members could afford individual litigation, the court system could not.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and the court system.  Therefore, the class action device presents far fewer case

management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision in a single court.

## X. VIOLATIONS ALLEGED

### A. First Claim for Relief: Violation of State Antitrust Statutes

247. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

248. Plaintiff Brian Luscher ("**Arizona Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Arizona.

    b. Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Arizona; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) the Arizona Plaintiff and members of the Arizona Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

    c. During the Class Period, Defendant's illegal conduct substantially affected Arizona commerce.

    d. As a direct and proximate result of Defendant's unlawful conduct, the Arizona Plaintiff and members of the Arizona Indirect Purchaser Class have been injured in their business and property.

    e. By reason of the foregoing, Defendant have entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§44-1401, *et seq*. Accordingly, the Arizona Plaintiff and the members of the Arizona Indirect

Purchaser Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

    f.   In compliance with Arizona's Antitrust Act, Ariz. Rev. Stat. § 44-1415, Plaintiffs will mail a copy of the Complaint to the Arizona Attorney General.

249.   Plaintiffs Jeffrey Figone and Steven Ganz ("**California Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

    a.   Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including November 25, 2007, Defendant and its co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendant acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of CRTs at supra-competitive levels.

    b.   The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendant and its co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for CRTs.

    c.   For the purpose of forming and effectuating the unlawful trust, the Defendant and its co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following: (1) fixing, raising, stabilizing and/or maintaining the price of CRTs; and (2) allocating among themselves the production of CRTs.

    d.   The combination and conspiracy alleged herein has had, *inter alia,* the following effects: (1) price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California; (2) prices

59

for CRTs sold by Defendant and its co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and (3) those who purchased CRTs directly or indirectly from Defendant and its co-conspirators have been deprived of the benefit of free and open competition.

e.  As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs and the members of the California Class have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendant's unlawful conduct. As a result of Defendant's violation of Section 16720 *et seq.* of the California Business and Professions Code, Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

250.  Plaintiff Law Suites ("**DC Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in the District of Columbia.

b.  Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) the DC Plaintiff and members of the District of Columbia Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.  During the Class Period, Defendant's illegal conduct substantially affected District of Columbia commerce.

d.  As a direct and proximate result of Defendant's unlawful conduct, the DC Plaintiff and members of the District of Columbia Indirect Purchaser Class have been injured in their business and property.

e.  By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, the DC Plaintiff and the members of the District of Columbia Indirect Purchaser Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

251.  Plaintiff Sandra Riebow ("**Hawaii Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Hawaii.

b.  Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.  During the Class Period, Defendant's illegal conduct substantially affected Hawaii commerce.

d.  As a direct and proximate result of Defendant's unlawful conduct, the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class have been injured in their business and property.

e.  By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Hawaii Code, H.R.S. § 480-4.  Accordingly, the Hawaii

61

Plaintiff and the members of the Hawaii Indirect Purchaser Class seek all forms of relief available under Hawaii Code, H.R.S. § 480-1 *et seq*.

    f.   In compliance with Hawaii Rev. Stat. § 480-13.3, Plaintiffs will serve a copy of the Complaint on the Hawaii Attorney General.

252.   Plaintiff Travis Burau ("**Iowa Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.   Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Iowa.

    b.   Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout the Iowa; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the Iowa; (3) the Iowa Plaintiff and the members of the Iowa Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

    c.   During the Class Period, Defendant's illegal conduct substantially affected Iowa commerce.

    d.   As a direct and proximate result of Defendant's unlawful conduct, the Iowa Plaintiff and members of the Iowa Indirect Purchaser Class have been injured in their business and property.

    e.   By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 et *seq*. Accordingly, the Iowa Plaintiff and the members of the Iowa Indirect Purchaser Class seek all forms of relief available under Iowa Code §§ 553.1.

253.    Plaintiff Southern Office Supply, Inc. ("**Kansas Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

  a.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Kansas.

  b.  Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Kansas; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) the Kansas Plaintiff and members of the Kansas Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

  c.  During the Class Period, Defendant's illegal conduct substantially affected Kansas commerce.

  d.  As a direct and proximate result of Defendant's unlawful conduct, the Kansas Plaintiff and members of the Kansas Indirect Purchaser Class have been injured in their business and property.

  e.  By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.* Accordingly, the Kansas Plaintiff and the members of the Kansas Indirect Purchaser Class seek all forms of relief available under Kansas Stat. Ann. §§50-101 *et seq.*

254.    Plaintiff Kerry Lee Hall ("**Maine Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

  a.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

competitive levels, the prices at which CRTs were sold, distributed or obtained in Maine.

    b.   Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Maine; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Maine Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

    c.   During the Class Period, Defendant's illegal conduct substantially affected Maine commerce.

    d.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs and members of the Maine Indirect Purchaser Class have been injured in their business and property.

    e.   By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.* Accordingly, Plaintiffs and the members of the Maine Indirect Purchaser Class seek all forms of relief available under Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

    255.   Plaintiff Lisa Reynolds ("**Michigan Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.   Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Michigan.

    b.   Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Michigan; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) the Michigan Plaintiff and

64

members of the Michigan Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c. During the Class Period, Defendant's illegal conduct substantially affected Michigan commerce.

d. As a direct and proximate result of Defendant's unlawful conduct, the Michigan Plaintiff and members of the Michigan Indirect Purchaser Class have been injured in their business and property.

e. By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq.* Accordingly, the Michigan Plaintiff and the members of the Michigan Indirect Purchaser Class seek all forms of relief available under Michigan Comp. Laws Ann. §§ 445.771 *et seq.*

256. Plaintiffs David Norby and Barry Kushner ("**Minnesota Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Minnesota.

b. Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) the Minnesota Plaintiffs and members of the Minnesota Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c. During the Class Period, Defendant's illegal conduct substantially affected Minnesota commerce.

d.   As a direct and proximate result of Defendant's unlawful conduct, the Minnesota Plaintiffs and members of the Minnesota Indirect Purchaser Class have been injured in their business and property.

e.   By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.50 *et seq.* Accordingly, the Minnesota Plaintiffs and the members of the Minnesota Indirect Purchaser Class seek all forms of relief available under Minnesota Stat. §§ 325D.50 *et seq.*

257.   Plaintiff Suzanne Cotter ("**Mississippi Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.   Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Mississippi.

b.   Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) the Mississippi Plaintiff and members of the Mississippi Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.   During the Class Period, Defendant's illegal conduct substantially affected Mississippi commerce.

d.   As a direct and proximate result of Defendant's unlawful conduct, the Mississippi Plaintiff and members of the Mississippi Indirect Purchaser Class have been injured in their business and property.

e.   By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Mississippi Code Ann. §75-21-1 *et seq.* Accordingly, the

66

Mississippi Plaintiff and the members of the Mississippi Indirect Purchaser Class seek all forms of relief available under Mississippi Code Ann. §75-21-1 *et seq.*

258. Plaintiff Steven Fink ("**Nebraska Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

   a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Nebraska.

   b. Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

   c. During the Class Period, Defendant's illegal conduct substantially affected Nebraska commerce.

   d. As a direct and proximate result of Defendant's unlawful conduct, the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class have been injured in their business and property.

   e. By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. § 59-801 *et seq.* Accordingly, the Nebraska Plaintiff and the members of the Nebraska Indirect Purchaser Class seek all forms of relief available under Nebraska Rev. Stat. § 59-801 *et seq.*

259. Plaintiff Gregory Painter ("**Nevada Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

67

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Nevada.

b. Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Nevada; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) the Nevada Plaintiffs and members of the Nevada Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c. During the Class Period, Defendant's illegal conduct substantially affected Nevada commerce.

d. As a direct and proximate result of Defendant's unlawful conduct, the Nevada Plaintiffs and members of the Nevada Indirect Purchaser Class have been injured in their business and property.

e. By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*[1] Accordingly, the Nevada Plaintiffs and the members of the Nevada Indirect Purchaser Class seek all forms of relief available under Nevada Rev. Stat. Ann. §§ 598A *et seq.*

260.    Plaintiff Mary Ann Stephenson ("**New Mexico Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

[1] In compliance with the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. § 598A.210(3), Plaintiffs served a copy of the Complaint on the Nevada Attorney General.

competitive levels, the prices at which CRTs were sold, distributed or obtained in New Mexico.

b. Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c. During the Class Period, Defendant's illegal conduct substantially affected New Mexico commerce.

d. As a direct and proximate result of Defendant's unlawful conduct, the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class have been injured in their business and property.

e. By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.* Accordingly, the New Mexico Plaintiff and the members of the New Mexico Indirect Purchaser Class seek all forms of relief available under New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

261. Plaintiffs Janet Ackerman and Louise Wood ("**New York Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in New York.

b. Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout New York; (2) CRT prices were raised, fixed, maintained, and stabilized at

69

1  artificially high levels throughout New York; (3) the New York Plaintiffs and

2  members of the New York Indirect Purchaser Class paid supracompetitive,

3  artificially inflated prices for CRT Products.

4      c.  During the Class Period, Defendant's illegal conduct substantially affected

5          New York commerce.

6      d.  As a direct and proximate result of Defendant's unlawful conduct, the New

7          York Plaintiffs and members of the New York Indirect Purchaser Class have

8          been injured in their business and property.

9      e.  By reason of the foregoing, Defendant entered into agreements in restraint of

10         trade in violation of New York General Business Law § 340 *et seq.*

11         Accordingly, the New York Plaintiffs and the members of the New York

12         Indirect Purchaser Class seek all forms of relief available under New York

13         G.B.L. § 340 *et seq.*  In accordance with New York G.B.L. § 340.5, the New

14         York Plaintiff will serve a copy of this Complaint on the New York Attorney

15         General.

16  262.  Plaintiff Patricia Andrews ("**North Carolina Plaintiff**") incorporates and

17  realleges each and every allegation set forth in the preceding paragraphs of this Complaint and

18  further alleges as follows:

19     a.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by

20         affecting, fixing, controlling and/or maintaining, at artificial and/or non-

21         competitive levels, the prices at which CRTs were sold, distributed or

22         obtained in North Carolina.

23     b.  Defendant's combinations or conspiracies had the following effects: (1) CRT

24         price competition was restrained, suppressed, and eliminated throughout

25         North Carolina; (2) CRT prices were raised, fixed, maintained, and stabilized

26         at artificially high levels throughout North Carolina; (3) the North Carolina

27         Plaintiff and members of the North Carolina Indirect Purchaser Class paid

28         supracompetitive, artificially inflated prices for CRT Products.

|  | c. | During the Class Period, Defendant's illegal conduct substantially affected North Carolina commerce. |
|---|---|---|

c. During the Class Period, Defendant's illegal conduct substantially affected North Carolina commerce.

d. As a direct and proximate result of Defendant's unlawful conduct, the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class have been injured in their business and property.

e. By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.* Accordingly, the North Carolina Plaintiff and the members of the North Carolina Indirect Purchaser Class seek all forms of relief available under North Carolina Gen. Stat. §§ 75-1 *et seq.*

263. Plaintiff Gary Hanson ("**North Dakota Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in North Dakota.

b. Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) the North Dakota Plaintiff and members of the North Dakota Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c. During the Class Period, Defendant's illegal conduct substantially affected North Dakota commerce.

d. As a direct and proximate result of Defendant's unlawful conduct, the North Dakota Plaintiff and members of the North Dakota Indirect Purchaser Class have been injured in their business and property.

71

e. By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.* Accordingly, the North Dakota Plaintiff and the members of the North Dakota Indirect Purchaser Class seek all forms of relief available under North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

264. Plaintiff Angela Gardinier ("**Oregon Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Oregon.

b. Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Oregon; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) the Oregon Plaintiff and members of the Oregon Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c. During the Class Period, Defendant's illegal conduct substantially affected Oregon commerce.

d. As a direct and proximate result of Defendant's unlawful conduct, the Oregon Plaintiffs and members of the Oregon Indirect Purchaser Class have been injured in their business and property because they paid more for CRT Products purchased in Oregon than they would have in the absence of the conspiracy.

e. By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Or. Rev. Stat. §646.725. Accordingly, the Oregon

1  Plaintiff and the members of the Oregon Indirect Purchaser Class seek all

2  forms of relief available under Or. Rev. Stat. §646.780, *et seq.*

3  265.  Plaintiff Donna Marie Ellingson ("**South Dakota Plaintiff**") incorporates and

4  realleges each and every allegation set forth in the preceding paragraphs of this Complaint and

5  further alleges as follows:

6    a.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by

7       affecting, fixing, controlling and/or maintaining, at artificial and/or non-

8       competitive levels, the prices at which CRTs were sold, distributed or

9       obtained in South Dakota.

10   b.  Defendant's combinations or conspiracies had the following effects: (1) CRT

11      price competition was restrained, suppressed, and eliminated throughout

12      South Dakota; (2) CRT prices were raised, fixed, maintained, and stabilized at

13      artificially high levels throughout South Dakota; (3) the South Dakota

14      Plaintiff and members of the South Dakota Indirect Purchaser Class paid

15      supracompetitive, artificially inflated prices for CRT Products.

16   c.  During the Class Period, Defendant's illegal conduct substantially affected

17      South Dakota commerce.

18   d.  As a direct and proximate result of Defendant's unlawful conduct, the South

19      Dakota Plaintiff and members of the South Dakota Indirect Purchaser Class

20      have been injured in their business and property.

21   e.  By reason of the foregoing, Defendant entered into agreements in restraint of

22      trade in violation of South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

23      Accordingly, the South Dakota Plaintiff and the members of the South Dakota

24      Indirect Purchaser Class seek all forms of relief available under South Dakota

25      Codified Laws Ann. §§ 37-1 *et seq.*

26  266.  Plaintiff Alexander M. Nicholson, Jr. ("**Tennessee Plaintiff**") incorporates and

27  realleges each and every allegation set forth in the preceding paragraphs of this Complaint and

28  further alleges as follows:

73

1    a.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by

2        affecting, fixing, controlling and/or maintaining, at artificial and/or non-

3        competitive levels, the prices at which CRTs were sold, distributed or

4        obtained in Tennessee.

5    b.  Defendant's combinations or conspiracies had the following effects: (1) CRT

6        price competition was restrained, suppressed, and eliminated throughout

7        Tennessee; (2) CRT prices were raised, fixed, maintained, and stabilized at

8        artificially high levels throughout Tennessee; (3) the Tennessee Plaintiff and

9        members of the Tennessee Indirect Purchaser Class paid supracompetitive,

10       artificially inflated prices for CRT Products.

11   c.  During the Class Period, Defendant's illegal conduct substantially affected

12       Tennessee commerce.

13   d.  As a direct and proximate result of Defendant's unlawful conduct, the

14       Tennessee Plaintiff and members of the Tennessee Indirect Purchaser Class

15       have been injured in their business and property.

16   e.  By reason of the foregoing, Defendant entered into agreements in restraint of

17       trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.* Accordingly,

18       the Tennessee Plaintiff and the members of the Tennessee Indirect Purchaser

19       Class seek all forms of relief available under Tennessee Code Ann. §§ 47-25-

20       101 *et seq.*

21   267.  Plaintiff Margaret Slagle ("**Vermont Plaintiff**") incorporates and realleges each

22   and every allegation set forth in the preceding paragraphs of this Complaint and further alleges

23   as follows:

24   a.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by

25       affecting, fixing, controlling and/or maintaining, at artificial and/or non-

26       competitive levels, the prices at which CRTs were sold, distributed or

27       obtained in Vermont.

28

74

b. Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Vermont; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c. During the Class Period, Defendant's illegal conduct substantially affected Vermont commerce.

d. As a direct and proximate result of Defendant's unlawful conduct, the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class have been injured in their business and property.

e. By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.* Accordingly, the Vermont Plaintiff and the members of the Vermont Indirect Purchaser Class seek all forms of relief available under Vermont Stat. Ann. 9 §§ 2453 *et seq.*

268. Plaintiff John Larch ("**West Virginia Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in West Virginia.

b. Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) the West Virginia Plaintiff and members of the West Virginia Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

75

c. During the Class Period, Defendant's illegal conduct substantially affected West Virginia commerce.

d. As a direct and proximate result of Defendant's unlawful conduct, the West Virginia Plaintiff and members of the West Virginia Indirect Purchaser Class have been injured in their business and property.

e. By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1 *et seq.* Accordingly, the West Virginia Plaintiff and the members of the West Virginia Indirect Purchaser Class seek all forms of relief available under West Virginia Code §§ 47-18-1 *et seq.*

269. Plaintiff Brigid Terry ("**Wisconsin Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Wisconsin.

b. Defendant's combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) the Wisconsin Plaintiff and members of the Wisconsin Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c. During the Class Period, Defendant's illegal conduct substantially affected Wisconsin commerce.

d. As a direct and proximate result of Defendant's unlawful conduct, the Wisconsin Plaintiff and members of the Wisconsin Indirect Purchaser Class have been injured in their business and property.

76

e. By reason of the foregoing, Defendant entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01 *et seq.* Accordingly, the Wisconsin Plaintiff and the members of the Wisconsin Indirect Purchaser Class seek all forms of relief available under Wisconsin Stat. §§133.01 *et seq.*

**B.** **Second Claim for Relief: Violation of State Consumer Protection and Unfair Competition Statutes**

270. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

271. Defendant engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

272. Plaintiff Simon Lee (the "**Arkansas Plaintiff**") incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege as follows:

a. Defendant and its co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Arkansas by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Arkansas.

b. The foregoing conduct was unfair, unconscionable, or deceptive within the conduct of commerce within Arkansas.

c. Defendant's conduct misled consumers, withheld materials facts, and resulted in material misrepresentations to Plaintiff and members of the Arkansas Indirect Purchaser Class.

d. Defendant's conduct was willful.

e. Defendant's unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arkansas; (3) the Arkansas Plaintiff and members of the Arkansas Class were

deprived of free and open competition; and (4) the Arkansas Plaintiff and members of the Arkansas Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

f.    As a direct and proximate result of Defendant's conduct, the Arkansas Plaintiff and members of the Arkansas Indirect Purchaser Class have been injured in their business and property.

g.    By reason of the foregoing, Defendant has engaged in deceptive and unconscionable trade practices in violation of Arkansas Code § 4-88-107, and accordingly, the Arkansas Plaintiff and members of the Arkansas Indirect Purchaser Class seek all relief available under that statute.

273.    The **California Plaintiffs** incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege as follows:

a.    Beginning on a date unknown to Plaintiff, but at least as early as March 1, 1995, and continuing thereafter at least up through and including November 25, 2007, Defendant committed and continued to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

b.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendant for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

c.    The Defendant's conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendant, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and

78

Professions Code, Section 17200, *et seq.,* including, but not limited to, the violations of Section 16720, *et seq.,* of the California Business and Professions Code, set forth above;

d.  Defendant's acts, omissions, misrepresentations, practices and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; Defendant's act and practices are unfair to consumers of CRTs in the State of California and throughout the United States, within the meaning of Section 17200, California Business and Professions Code; and

e.  Defendant's acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

f.  California Plaintiff and each of the California Indirect Purchaser Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendant as a result of such business acts or practices.

g.  The unlawful and unfair business practices of Defendant, as described above, has caused the California Plaintiffs and the members of the California Indirect Purchaser Class to pay supra-competitive and artificially-inflated prices for CRT Products. The California Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

h.  The conduct of Defendant as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

i.  As alleged in this Complaint, Defendant and their co-conspirators have caused injury to the California Plaintiff and the California Indirect Purchaser Class as a result of their wrongful conduct and Defendant's unfair competition. The California Plaintiffs and the members of the California

Indirect Purchaser Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendant as a result of such business practices, pursuant to California Business & Professions Code §17200 *et seq.*

274. Plaintiff David Rooks (the "**Florida Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida.

b. The foregoing conduct constitutes "unfair methods of competition," and "unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Florida Stat. § 501.204.

c. During the Class Period, Defendant's illegal conduct substantially affected Florida commerce and consumers.

d. Defendant's unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) the Florida Plaintiff and members of the Florida Indirect Purchaser Class were deprived of free and open competition; and (4) the Florida Plaintiff and members of the Florida Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

e. As a direct and proximate result of Defendant's conduct, the Florida Plaintiff and members of the Florida Indirect Purchaser Class have been injured.

f. Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201 *et seq.*, and accordingly, the

Florida Plaintiffs and members of the Florida Indirect Purchaser Class seek
all relief available under that statute.

275. The **Hawaii Plaintiff** incorporates and realleges each and every allegation set
forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.  Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class
    purchased CRT Products primarily for personal, family, or household
    purposes.

b.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by
    affecting, fixing, controlling and/or maintaining, at artificial and/or non-
    competitive levels, the prices at which CRTs were sold, distributed or
    obtained in Hawaii.

c.  The foregoing conduct constitutes "unfair methods of competition and unfair
    or deceptive acts or practices in the conduct of any trade or commerce"
    within the meaning of Hawaii Rev. Stat. § 480-2, with intent to injure
    competitors and consumers through supra-competitive profits.

d.  Defendant fraudulently concealed its price-fixing conspiracy and withheld
    material facts regarding the true cause of price increases. Defendant's
    conduct had the capacity to deceive consumers and misled consumers into
    believing that increased prices were caused by non-conspiratorial
    circumstances.

e.  During the Class Period, Defendant's illegal conduct substantially affected
    Hawaii commerce and consumers.

f.  Defendant's unlawful conduct had the following effects: (1) CRT price
    competition was restrained, suppressed, and eliminated throughout Hawaii;
    (2) CRT prices were raised, fixed, maintained and stabilized at artificially
    high levels throughout Hawaii; (3) the Hawaii Plaintiff and members of the
    Hawaii Indirect Purchaser Class were deprived of free and open competition;

81

and (4) the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

    g. As a direct and proximate result of Defendant's conduct, the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class have been injured.

    h. Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-2. Accordingly, the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class seek all relief available under Hawaii Rev Stat. § 480 *et seq*.

276. Plaintiff Patrick Carleo, Jr. (the "**Massachusetts Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a. Defendant and its co-conspirators were engaged in trade or commerce as defined by G.L. c. 93A.

    b. Defendant and its co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Massachusetts.

    c. Defendant and its co-conspirators took efforts to conceal their agreements from the Massachusetts Plaintiff and members of the Massachusetts Indirect Purchaser Class.

    d. The foregoing conduct constitutes "unfair competition or unfair or deceptive acts or practices" within the meaning of Massachusetts G.L. c. 93A, §2 *et seq.*

    e. During the Class Period, Defendant's and its co-conspirators' illegal conduct substantially affected Massachusetts commerce and consumers.

    f. Defendant's unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) CRT prices were raised, fixed, maintained and stabilized

1  at artificially high levels throughout Massachusetts; (3) the Massachusetts

2  Plaintiff and members of the Massachusetts Indirect Purchaser Class were

3  deprived of free and open competition; and (4) the Massachusetts Plaintiff

4  and members of the Massachusetts Indirect Purchaser Class paid

5  supracompetitive, artificially inflated prices for CRT Products.

6  g.  As a direct and proximate result of Defendant's conduct, the Massachusetts

7  Plaintiff and members of the Massachusetts Indirect Purchaser Class have

8  been injured.

9  h.  On March 3, 2017, in compliance with Massachusetts G.L. c. 93A, § 9,

10  Plaintiff mailed a written demand for relief to the Defendant named herein,

11  which (1) identified the Massachusetts Plaintiff; (2) reasonably described the

12  unfair and deceptive acts and practices, the injury suffered and the damages

13  sought; and (3) requested that Defendant make a reasonable, class-wide

14  tender of settlement. More than thirty days has passed since the demand letter

15  was served, and Defendant has failed to make a reasonable settlement offer.

16  i.  By reason of the foregoing, Defendant has engaged in unfair competition or

17  unfair or deceptive acts or practices in violation of Massachusetts G.L. c.

18  93A, §2.  Defendant and its co-conspirators' violations of Chapter 93A were

19  knowing or willful, entitling the Massachusetts Plaintiff and members of the

20  Massachusetts Indirect Purchaser Class to multiple damages.

21  277.  Plaintiff Kathryn Gumm (the "**Missouri Plaintiff**") incorporates and realleges

22  each and every allegation set forth in the preceding paragraphs of this Complaint and further

23  alleges as follows:

24  a.  The Missouri Plaintiff and members of the Missouri Indirect Purchaser Class

25  purchased CRTs primarily for personal, family, or household purposes.

26  b.  Defendant and its co-conspirators engaged in the conduct described herein in

27  connection with the sale of CRT in trade or commerce in a market that

28  includes Missouri.

83

c.   Defendant and its co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which CRTs were sold, distributed, or obtained in Missouri, which conduct constituted unfair and deceptive trade practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to the Missouri Plaintiff and the members of the Missouri Indirect Purchaser Class.

d.   Defendant and its co-conspirators concealed, suppressed, and omitted to disclose material facts to the Missouri Plaintiff and the members of the Missouri Indirect Purchaser Class concerning their unlawful activities and artificially inflated prices for CRTs. The concealed, suppressed, and omitted facts would have been important to the Missouri Plaintiff and the members of the Missouri Indirect Purchaser Class as they related to the cost of CRTs they purchased.

e.   Defendant and its co-conspirators misrepresented the real cause of price increases and/or the absence of price reductions in CRTs by making public statements that were not in accord with the facts.

f.   Defendant and its co-conspirators' statements and conduct concerning the price of CRTs were deceptive as they had the tendency or capacity to mislead the Missouri Plaintiff and the members of the Missouri Indirect Purchaser Class to believe that they were purchasing CRTs at prices established by a free and fair market.

g.   Defendant's and its co-conspirators' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Missouri; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) the Missouri Plaintiff and members of the Missouri Indirect Purchaser Class were deprived of free and open competition; and (4) the Missouri Plaintiff and members of

84

the Missouri Indirect Purchaser Class paid supra-competitive, artificially inflated prices for CRT Products.

h.  The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act (the "MMPA"), specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…."

i.  As a direct and proximate result of the above-described unlawful practices, the Missouri Plaintiff and members of the Missouri Indirect Purchaser Class suffered ascertainable loss of money or property. Accordingly, the Missouri Plaintiff and members of the Missouri Indirect Purchaser Class seek all relief available under MMPA, specifically Mo. Rev. Stat. 407.020, as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, et seq., 15 CSR 60-8.010, et seq., and 15 CSR 60-9.010, et seq., and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

278.  Plaintiff Richard Jones (the "**Montana Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.  Montana Plaintiff and members of the Montana Indirect Purchaser Class purchased CRT Products primarily for personal, family, or household purposes.

b.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRT Products were sold, distributed or obtained in Montana.

85

c. Defendants' combinations or conspiracies had the following effects: (1) CRT Product price competition was restrained, suppressed, and eliminated throughout Montana; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff and members of the Montana Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

d. The foregoing conduct constitutes "unfair or deceptive acts or practices in the conduct of any trade or commerce," within the meaning of Montana Code § 30-14-103.

e. As a direct and proximate result of Defendants' conduct, the Montana Plaintiff and members of the Montana Indirect Purchaser Class have been injured, and accordingly, the Montana Plaintiff and members of the Montana Indirect Purchaser Class seek all relief available under Montana Code § 30-14-101, *et seq*.

279. The **Nebraska Plaintiffs** incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce, a substantial part of which occurred in Nebraska, by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Nebraska.

b. The foregoing conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Neb. Rev. Stat. § 59-1602.

c. During the Class Period, Defendant's illegal conduct substantially affected Nebraska commerce and consumers.

d. Defendant's unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) CRT prices were raised, fixed, maintained and stabilized at artificially

86

high levels throughout Nebraska; (3) the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class were deprived of free and open competition; and (4) the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

e. As a direct and proximate result of Defendant's conduct, the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class have been injured.

f. Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601 *et seq.*, and accordingly, the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class seek all relief available under that statute.

280. Plaintiff John Murphy (the "**New Hampshire Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in New Hampshire.

b. Defendant's conduct was intended to deceive New Hampshire consumers regarding the nature of Defendant's actions within the stream of New Hampshire commerce.

c. Defendant's conduct was willful and knowing.

d. Defendant's conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiff and Class members' ability to protect themselves.

e. The foregoing conduct constitutes unfair competition or unfair or deceptive acts or practices in violation of New Hampshire Rev. Stat. §358-A:2, *et seq.*

87

f.  During the Class Period, Defendant's illegal conduct substantially affected New Hampshire commerce and consumers.

g.  Defendant's unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) the New Hampshire Plaintiff and members of the New Hampshire Indirect Purchaser Class were deprived of free and open competition; and (4) the New Hampshire Plaintiff and members of the New Hampshire Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

h.  As a direct and proximate result of Defendant's conduct, the New Hampshire Plaintiff and members of the New Hampshire Indirect Purchaser Class have been injured in their business and property.

i.  By reason of the foregoing, Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of New Hampshire Rev. Stat. §358-A:2, and accordingly, the New Hampshire Plaintiff and members of the New Hampshire Indirect Purchaser Class seek all relief available under §§ 358-A:10 and 358-A:10-a of that statute.

281.  The **New Mexico Plaintiff** incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in New Mexico.

b.  Defendant also took efforts to conceal its agreements from the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class.

c.  The foregoing conduct constitutes "unfair or deceptive trade practices" and "unconscionable trade practices in the conduct of any trade or commerce"

88

within the meaning of New Mexico Stat. § 57-12-3, in that such conduct resulted in a gross disparity between the value received by New Mexico Plaintiffs and the members of the New Mexico Indirect Purchaser Class and the prices paid by them for CRT Products as set forth in New Mexico Stat. § 57-12-2E.

d. During the Class Period, Defendant's illegal conduct substantially affected New Mexico commerce and consumers.

e. Defendant's unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class were deprived of free and open competition; and (4) the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

f. As a direct and proximate result of Defendant's conduct, the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class have been injured.

g. Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1 *et seq.*, and accordingly, the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class seek all relief available under that statute.

282. The **New York Plaintiffs** incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in New York.

89

b. Defendant also took efforts to conceal its agreements from the New York Plaintiff and members of the New York Indirect Purchaser Class.

c. Defendant's illegal conduct substantially affected New York commerce and consumers.

d. The conduct of Defendant as described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

e. As consumers, the New York Plaintiffs and the members of the New York Indirect Purchaser Class were targets of the conspiracy.

f. Defendant's secret agreements as described herein were not known to the New York Plaintiffs or the members New York Indirect Purchaser Class.

g. Defendant made public statements about the price of CRTs that Defendant knew would be seen by the New York Plaintiffs and the members of the New York Indirect Purchaser Class; such statements either omitted material information that rendered these statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for CRTs; and, Defendant alone possessed material information that was relevant to consumers, but failed to provide the information.

h. Because of Defendant's unlawful trade practices in the State of New York, there was a broad impact on the New York Plaintiffs and the members of the New York Indirect Purchaser Class who indirectly purchased CRTs; and the New York Plaintiffs and the members of the New York Indirect Purchaser Class have been injured because they have paid more for CRT Products than they would have paid in the absence of Defendant's unlawful trade acts and practices.

i. Because of Defendant's unlawful trade practices in the State of New York, the New York Plaintiffs and the members of the New York Indirect Purchaser Class who indirectly purchased CRT Products were misled to believe that they were paying a fair price for CRT Products, or that the price increases for CRTs were for valid business reasons.

j. Defendant knew that its unlawful trade practices with respect to pricing of CRTs would have an impact on the New York Plaintiffs and the members of the New York Indirect Purchaser Class and not just Defendant's direct customers;

k. Defendant knew that its unlawful trade practices with respect to pricing of CRTs would have a broad impact, causing consumer class members who indirectly purchased CRTs to be injured by paying more for CRT Products than they would have paid in the absence of Defendant's unlawful trade acts and practices.

l. During the Class Period, Defendant, directly or indirectly through affiliates it dominated and controlled, manufactured, sold and/or distributed CRTs in New York.

m. The New York Plaintiffs and members of the New York Indirect Purchaser Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial. Without prejudice to their contention that Defendant's unlawful conduct was willful and knowing, the New York Plaintiffs and members of the New York Indirect Purchaser Class do not seek in this action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349 (h).

283. The **North Carolina Plaintiff** incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

competitive levels, the prices at which CRTs were sold, distributed or obtained in North Carolina.

b. Defendant also took efforts to conceal its agreements from the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class.

c. The conduct of Defendant as described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina Gen. Stat. §75-1.1 *et seq.*, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

d. During the Class Period, Defendant's illegal conduct substantially affected North Carolina commerce and consumers.

e. Defendant's unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class were deprived of free and open competition; and (4) the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

f. As a direct and proximate result of Defendant's conduct, the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class have been injured.

g. During the Class Period, Defendant, directly or indirectly through affiliates they dominated and controlled, manufactured, sold and/or distributed CRTs in North Carolina.

h. Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1 *et seq.*, and

92

accordingly, the North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class seek all relief available under that statute.

284. The **Oregon Plaintiff** incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege as follows:

    a.   Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Oregon.

    b.   By reason of the conduct alleged herein, Defendant has violated Or. Rev. Stat. § 646.608, *et seq*.

    c.   Defendant's conduct was conducted with intent to deceive Oregon consumers regarding the nature of Defendant's actions within the stream of Oregon commerce.

    d.   Defendant made public statements that Defendant knew would be seen by the Oregon Plaintiff and members of the Oregon Indirect Purchaser Class; such statements created a likelihood of confusion or misunderstanding with respect to the real reasons that the prices of CRTs and CRT Products were rising; and, such statements either omitted material information that rendered the statements materially misleading and confusing, or affirmatively deceived such consumers about the real cause of price increases for CRTs and CRT Products.

    e.   Because of Defendant's unlawful and unconscionable trade practices in Oregon, the Oregon Plaintiff and members of the Oregon Indirect Purchaser Class were misled or deceived to believe that they were paying a fair price for CRT Products or that the price increases for CRTs and CRT Products were for valid business reasons.

93

f.   Defendant knew that its violations with respect to pricing of CRTs would have a broad impact, causing persons who indirectly purchased CRT Products to be injured by paying more for CRT Products than they would have paid in the absence of Defendant's unlawful and unconscionable trade acts and practices.

g.   Defendant's conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

h.   Defendant's conduct misled Oregon consumers, withheld material facts, and had a direct or indirect impact upon Plaintiff's and class members' ability to protect themselves.

i.   Defendant's violations substantially affected Oregon's trade and commerce.

j.   Defendant's unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Oregon; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) the Oregon Plaintiff and members of the Oregon Indirect Purchaser Class were deprived of free and open competition; and (4) the Oregon Plaintiff and members of the Oregon Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

k.   As a direct and proximate result of Defendant's illegal conduct, the Oregon Plaintiff and the members of the Oregon Indirect Purchaser Class suffered an ascertainable loss of money or property as a result of Defendant's use or employment of unconscionable and deceptive trade practices as set forth above. That loss was caused by Defendant's willful and deceptive conduct, as described herein.

l.    By reason of the foregoing, Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.608, and accordingly, the Oregon Plaintiff and members of the Oregon Indirect Purchaser Class seek all relief available under §646.638 of that statute.

94

m.  Pursuant to Oregon Rev. Stat. § 646.638(2), a copy of this complaint is being mailed to the Oregon Attorney General in conjunction with its filing.

285.  Christine Longo (the "**Rhode Island Plaintiff**") incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege as follows:

a.  Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class purchased CRT Products primarily for personal, family, or household purposes.

b.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Rhode Island.

c.  Defendant deliberately failed to disclose material facts to the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class concerning Defendant's unlawful activities and artificially inflated prices for CRTs. Defendant owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendant breached that duty by its silence. Defendant misrepresented to all consumers during the Class Period that Defendant's CRT prices were competitive and fair.

d.  Defendant made public statements that Defendants knew would be seen by the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class who indirectly purchased CRT Products primarily for personal, family or household purposes; such statements created a likelihood of confusion or misunderstanding with respect to the real reasons that the prices of CRTs were rising; and, such statements either omitted material information that rendered the statements materially misleading and confusing,

1       or affirmatively deceived such consumers about the real cause of price

2       increases for CRTs.

3     e.  Defendant's deception, including its affirmative misrepresentations and/or

4       omissions concerning the price of CRTs, constitutes information necessary to

5       Plaintiff and members of the Rhode Island Indirect Purchaser Class relating to

6       the cost of CRT Products purchased.

7     f.  Because of Defendant's unlawful and unscrupulous trade practices in Rhode

8       Island, the Rhode Island Plaintiff and members of the Rhode Island Indirect

9       Purchaser Class who indirectly purchased CRT Products primarily for

10      personal, family or household purposes were misled or deceived to believe

11      that they were paying a fair price for CRT Products or that the price increases

12      for CRTs were for valid business reasons.

13     g.  Defendant knew that its unscrupulous and unlawful trade practices with

14      respect to pricing CRTs would have an impact on Rhode Island natural

15      persons who indirectly purchased CRT Products primarily for personal,

16      family or household purposes and not just Defendant's direct customers.

17     h.  Defendant knew that its violations with respect to pricing of CRTs would

18      have a broad impact, causing natural persons who indirectly purchased CRT

19      Products primarily for personal, family or household purposes to be injured

20      by paying more for CRT Products than they would have paid in the absence

21      of Defendant's unlawful trade acts and practices.

22     i.  Defendant's violations adversely affected public policy in Rhode Island.

23     j.  Defendant's unlawful conduct had the following effects: (1) CRT price

24      competition was restrained, suppressed, and eliminated throughout Rhode

25      Island; (2) CRT prices were raised, fixed, maintained and stabilized at

26      artificially high levels throughout Rhode Island; (3) the Rhode Island Plaintiff

27      and members of the Rhode Island Indirect Purchaser Class were deprived of

28      free and open competition; and (4) the Rhode Island Plaintiff and members of

the Rhode Island Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

    k.  As a direct and proximate result of Defendant's illegal conduct, the Rhode Island Plaintiff and the members of the Rhode Island Indirect Purchaser Class suffered an ascertainable loss of money or property as a result of Defendant's use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendant's willful and deceptive conduct, as described herein.

    l.  By reason of the foregoing, Defendant has engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws § 6-13.1-1, *et seq.,* and accordingly, the Rhode Island Plaintiff and members of the Rhode Island Indirect Purchaser Class seek all relief available under that statute.

286. Plaintiff Chris Carrington (the "**South Carolina Plaintiff**") incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege as follows:

    a.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in South Carolina.

    b.  Defendant's conduct was willful.

    c.  Defendant deliberately failed to disclose material facts to the South Carolina Plaintiff and members of the South Carolina Indirect Purchaser Class concerning Defendant's unlawful activities and artificially inflated prices for CRTs. Defendant owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendant breached that duty by its silence. Defendant misrepresented to all

consumers during the Class Period that Defendant's CRT prices were competitive and fair.

d. Defendant's deception, including its affirmative misrepresentations and/or omissions concerning the price of CRTs, constitutes information necessary to Plaintiff and members of the South Carolina Class relating to the cost of CRT Products purchased.

e. Because of Defendant's unlawful and unscrupulous trade practices in South Carolina, the South Carolina Plaintiff and members of the South Carolina Indirect Purchaser Class who indirectly purchased CRTs were misled or deceived to believe that they were paying a fair price for CRT Products or that the price increases for CRTs were for valid business reasons.

f. Defendant's unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Carolina; (3) the South Carolina Plaintiff and members of the South Carolina Indirect Purchaser Class were deprived of free and open competition; and (4) the South Carolina Plaintiff and members of the South Carolina Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

g. As a direct and proximate result of Defendant's illegal conduct, the South Carolina Plaintiff and the members of the South Carolina Indirect Purchaser Class suffered an ascertainable loss of money or property as a result of Defendant's use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendant's willful and deceptive conduct, as described herein.

h. Defendant's misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of South Carolina Code Ann. § 39-5-10, *et seq.,* and accordingly, South Carolina

98

1  Plaintiff and members of the South Carolina Indirect Purchaser Class seek all

2  relief available under that statute.

3    i. Pursuant to South Carolina Code Ann. §39-5-140(b), a copy of this complaint

4     is being mailed to the South Carolina Attorney General in conjunction with its

5     filing.

6   287. Plaintiff Richard Shew (the "**Utah Plaintiff**") incorporates and realleges, as

7  though fully set forth herein, each and every allegation set forth in the preceding paragraphs of

8  this Complaint, and further allege as follows:

9    a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by

10    affecting, fixing, controlling and/or maintaining, at artificial and/or non-

11    competitive levels, the prices at which CRTs were sold, distributed or

12    obtained in Utah.

13   b. Defendant is a supplier within the meaning of Utah Code Ann. §§ 13-11-3.

14   c. Defendant's conduct was unfair, unconscionable, or deceptive within the

15    conduct of commerce within the State of Utah.

16   d. Defendant's conduct and/or practices were unconscionable and were

17    undertaken in connection with consumer transactions.

18   e. Defendant knew or had reason to know that its conduct was unconscionable.

19   f. Defendant knew that its violations with respect to pricing of CRTs would

20    have a broad impact, causing persons who indirectly purchased CRT Products

21    primarily for personal, family or household purposes to be injured by paying

22    more for CRT Products than they would have paid in the absence of

23    Defendant's unlawful trade acts and practices.

24   g. Defendant deliberately failed to disclose material facts to the Utah Plaintiff

25    and members of the Utah Indirect Purchaser Class concerning Defendant's

26    unlawful activities and artificially inflated prices for CRTs.  Defendant owed

27    a duty to disclose such facts, and considering the relative lack of

28    sophistication of the average consumer, Defendant breached that duty by its

**INDIRECT PURCHASER PLAINTIFFS' CLASS ACTION COMPLAINT AGAINST MITSUBISHI ELECTRIC**

silence.  Defendant misrepresented to all consumers during the Class Period that Defendant's CRT prices were competitive and fair.

h.  Because of Defendant's unlawful and unconscionable trade practices in Utah, the Utah Plaintiff and members of the Utah Indirect Purchaser Class who indirectly purchased CRTs were misled or deceived to believe that they were paying a fair price for CRT Products or that the price increases for CRTs were for valid business reasons.

i.  Defendant's unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Utah; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) the Utah Plaintiff and members of the Utah Indirect Purchaser Class were deprived of free and open competition; and (4) the Utah Plaintiff and members of the Utah Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

j.  As a direct and proximate result of Defendant's illegal conduct, the Utah Plaintiff and the members of the Utah Indirect Purchaser Class suffered an ascertainable loss of money or property as a result of Defendant's use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendant's willful and deceptive conduct, as described herein.

k.  Defendant's misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, *et seq.,* and accordingly, Utah Plaintiff and members of the Utah Indirect Purchaser Class seek all relief available under that statute.

288.  The Utah Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.  Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

100

competitive levels, the prices at which CRTs were sold, distributed or obtained in Utah.

b. By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. § 13-5-1, *et seq.*

c. Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly of trade or commerce in the market for CRTs, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing or maintaining prices in the CRT market.

d. Defendant's conduct caused or was intended to cause unfair methods of competition within the State of Utah.

e. Defendant's unlawful conduct substantially affected Utah's trade and commerce.

f. As a direct and proximate result of Defendant's unlawful conduct, the Utah Plaintiff and members of the Utah Indirect Purchaser Class have been injured in their business or property in that they paid more for CRT Products than they would have paid in the absence of Defendant's unfair methods of competition.

g. By reason of the foregoing, the Utah Plaintiff and the Utah Indirect Purchaser Class seek all forms of relief available under Utah Code Ann. §§ 13-5-14, *et seq*.

289. The **Vermont Plaintiff** incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendant agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Vermont.

b. Defendant deliberately failed to disclose material facts to the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class concerning

101

1     Defendant's unlawful activities and artificially inflated prices for CRTs.

2     Defendant owed a duty to disclose such facts, and considering the relative

3     lack of sophistication of the average, non-business consumer, Defendant

4     breached that duty by its silence.  Defendant misrepresented to all consumers

5     during the Class Period that Defendant's CRT prices were competitive and

6     fair.

7     c.  Because of Defendant's unlawful and unscrupulous trade practices in

8     Vermont, the Vermont Plaintiff and members of the Vermont Indirect

9     Purchaser Class who indirectly purchased CRTs were misled or deceived to

10     believe that they were paying a fair price for CRT Products or that the price

11     increases for CRTs were for valid business reasons.

12     d.  Defendant's unlawful conduct had the following effects: (1) CRT price

13     competition was restrained, suppressed, and eliminated throughout Vermont;

14     (2) CRT prices were raised, fixed, maintained and stabilized at artificially

15     high levels throughout Vermont; (3) the Vermont Plaintiff and members of

16     the Vermont Indirect Purchaser Class were deprived of free and open

17     competition; and (4) the Vermont Plaintiff and members of the Vermont

18     Indirect Purchaser Class paid supracompetitive, artificially inflated prices for

19     CRT Products.

20     e.  As a direct and proximate result of Defendant's illegal conduct, the Vermont

21     Plaintiff and the members of the Vermont Indirect Purchaser Class suffered

22     an ascertainable loss of money or property as a result of Defendant's use or

23     employment of unconscionable and deceptive commercial practices as set

24     forth above.  That loss was caused by Defendant's willful and deceptive

25     conduct, as described herein.

26     f.  Defendant's misleading conduct and unconscionable activities constitutes

27     unfair competition or unfair or deceptive acts or practices in violation of

28     Vermont Stat. Ann. Title 9, § 2451 *et seq.,* and accordingly, Vermont Plaintiff

and members of the Vermont Indirect Purchaser Class seek all relief available under that statute.

## XI. FRAUDULENT CONCEALMENT

290.    Throughout the relevant period, Defendant and its co-conspirators affirmatively and fraudulently concealed their unlawful conduct against Plaintiffs and the Classes.

291.    Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before the CRT litigation commenced, at which time they discovered the existence of the conspiracy but not the role played by Defendant. Nor could Plaintiffs and the Class members have discovered the violations earlier than that time because Defendant and its co-conspirators conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. In addition, the conspiracy was by its nature self-concealing.

292.    Defendant and its co-conspirators engaged in a successful, illegal price-fixing conspiracy with respect to CRTs, which they affirmatively concealed, in at least the following respects:

a.   By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme, and by agreeing to expel those who failed to do so;

b.   By agreeing among themselves to limit the number of representatives from Defendant and each co-conspirator attending the meetings so as to avoid detection;

c.   By agreeing among themselves to refrain from listing the individual representatives of the Defendant and co-conspirators in attendance at meetings in any meeting report;

d.   By agreeing among themselves to refrain from taking meeting minutes or taking any kind of written notes during the meetings;

103

e.  By giving false and pretextual reasons for their CRT price increases during the relevant period and by describing such pricing falsely as being the result of external costs rather than collusion;

f.  By agreeing among themselves on what to tell their customers about price changes, and agreeing upon which attendee would communicate the price change to which customer;

g.  By agreeing among themselves to quote higher prices to certain customers than the fixed price in effect to give the appearance that the price was not fixed;

h.  By agreeing among themselves upon the content of public statements regarding capacity and supply;

i.  By agreeing among themselves to eliminate references in expense reports which might reveal the existence of their unlawful meetings;

j.  By agreeing among themselves to destroy their conspiratorial communications to avoid leaving any evidence of it; and

k.  By agreeing on other means to avoid detection of their illegal conspiracy to fix the prices of CRTs.

293. Plaintiffs have additional evidence of these acts of fraudulent concealment by Defendant and its co-conspirators, but this evidence is designated Highly Confidential pursuant to a protective order in the related *CRT* litigation, and cannot be placed in the public record.

294. In November 2007, Plaintiffs and the Classes filed a complaint (now in MDL No. 1917) alleging the conspiracy described herein against numerous companies. However, Plaintiffs and the Classes did not suspect that Defendant might have had a role in the conspiracy until 2011, when they uncovered evidence indicating Defendant's possible involvement. They entered into a tolling agreement with Defendant in 2011, further described below.

295. As a result of the fraudulent concealment of the conspiracy by Defendant and its co-conspirators, Plaintiffs and the Classes assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiffs and the members of the Classes.

# XII. <u>TOLLING</u>

296.     On November 7, 2011, Plaintiffs and Mitsubishi Electric entered into a tolling agreement.  This tolling agreement tolled all limitations periods for all claims that Plaintiffs could have asserted against Mitsubishi Electric and its subsidiaries as of the effective date of the agreement and through no later than the filing of this complaint.  The tolling agreement is no longer in effect.

# XIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray as follows:

A.     That the Court determine that the claims alleged herein under state antitrust laws, state consumer protection laws, and/or unfair competition principles may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, as informed by the respective state class action laws;

B.     That the Court adjudge and decree that the unlawful conduct, contract, combination and conspiracy alleged herein constitutes:

      a.     A violation of the state antitrust laws as alleged in the First Claim for Relief; and

      b.     A violation of the state consumer protection and unfair competition laws as alleged in the Second Claim for Relief.

C.     That Plaintiffs and the Indirect Purchaser State Classes recover damages, as provided by the state antitrust laws, consumer protection laws, and unfair competition laws alleged herein, and that a judgment in favor of Plaintiffs and the Classes be entered against the Defendant in an amount to be trebled in accordance with such laws;

D.     That the Court award Plaintiffs and the Classes they represent pre-judgment and post-judgment interest as permitted by law;

E.     That Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees as provided by law; and

F.     That the Court award Plaintiffs and the Classes they represent such other and further relief as may be necessary and appropriate.

# XIV. JURY DEMAND

Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  February 6, 2020    By:    /s/ Mario N. Alioto

**TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP**
Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

*Lead Counsel for Indirect Purchaser Plaintiffs*

INDIRECT PURCHASER PLAINTIFFS' CLASS ACTION COMPLAINT AGAINST MITSUBISHI ELECTRIC

**Additional Plaintiffs' Counsel:**

| | |
|---|---|
| Sylvie K. Kern<br>**LAW OFFICES OF SYLVIE KULKIN KERN**<br>2532 Lake Street<br>San Francisco, CA 94121<br>Telephone: (415) 221-5763<br>kernantitrustglobal@gmail.com | David Boies<br>Timothy Battin<br>Nathan Cihlar<br>**STRAUS & BOIES, LLP**<br>4041 University Drive, Fifth Floor<br>Fairfax, VA 22030<br>dboies@straus-boies.com<br>tbattin@straus-boies.com<br>ncihlar@straus-boies.com |
| David Freedman<br>Joseph Goldberg<br>**FREEDMAN, BOYD, HOLLANDER, GOLDBERG & IVES, PA**<br>20 First Plaza, Suite 700<br>Albuquerque, NM 87102<br>Tel: (505) 842-9960<br>Fax: (505) 842-0761<br>daf@fbdlaw.com<br>jg@fbdlaw.com | Christopher Micheletti<br>Judith A. Zahid<br>Qianwei Fu<br>**ZELLE LLP**<br>44 Montgomery Street, Suite 3400<br>San Francisco, CA 94104<br>cmicheletti@zelle.com<br>jzahid@zelle.com<br>qfu@zelle.com |
| Lawrence G. Papale<br>**LAW OFFICES OF LAWRENCE G. PAPALE**<br>1308 Main Street #117<br>St. Helena, CA 94574<br>Telephone: (707) 963-1704<br>Facsimile: (707) 963-0706<br>lgpapale@papalelaw.com | Daniel E. Birkhaeuser<br>Jennifer S. Rosenberg<br>**BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP**<br>2125 Oak Grove Road, Suite 120<br>Walnut Creek, CA 94598<br>dbirkhaeuser@bramsonplutzik.com<br>jrosenberg@bramsonplutzik.com |
| Donald L. Perelman<br>Matthew Duncan<br>**FINE KAPLAN & BLACK R.P.C.**<br>One South Broad Street, Suite 2300<br>Philadelphia, Pennsylvania 19107<br>Phone: (215) 567-6565<br>Fax: (215) 568-5872<br>Email: dperelman@finekaplan.com<br>mduncan@finekaplan.com | Christopher Lovell<br>Craig Essenmacher<br>Keith Essenmacher<br>**LOVELL STEWART HALEBIAN LLP**<br>500 Fifth Avenue, Floor 58<br>New York, NY 10110<br>clovell@lshllp.com<br>cessenmacher@lshllp.com |
| Daniel Hume<br>Robert J. Gralewski<br>**KIRBY McINERNEY LLP**<br>825 Third Avenue, 16th Floor<br>New York, NY 10022<br>Tel: (212) 317-2300 | Jennie Lee Anderson<br>**ANDRUS ANDERSON LLP**<br>155 Montgomery Street, 9th Floor<br>San Francisco, California 94104<br>Telephone: (415) 986-1400<br>Facsimile: (415) 986-1474 |

dhume@kmllp.com
bgralewski@kmllp.com

jennie@andrusanderson.com

Seymour J. Mansfield
**FOLEY & MANSFIELD PLLP**
250 Marquette Avenue
Suite 1200
Minneapolis, MN 55401
(612) 338-8788
smansfield@foleymansfield.com

Marvin A. Miller
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
mmiller@millerlawllc.com

Michael G. Simon
M. Eric Frankovitch
**FRANKOVITCH, ANETAKIS,
COLANTONIO & SIMON**
337 Penco Road
Weirton, WV 26062
Telephone: (304) 723-4400
Facsimile: (304) 723-5892
msimon@facslaw.com

Joel M. Carney
**WALENTINE, O'TOOLE, MCQUILLAN
& GORDON, LLP**
11240 Davenport Street
P.O. Box 540125
Omaha, NE 68154-0125
402-330-6300
joel@womglaw.com

Dennis Stewart
**GUSTAFSON GLUEK PLLC**
600 B Street, 17th Fl.
San Diego, CA 92101
Telephone: (619) 595-3299
Email: dstewart@gustafsongluek.com

Daniel R. Karon
**KARON LLC**
700 W. St. Clair Ave., Suite 200
Cleveland, OH 44113
Email: dkaron@karonllc.com

John Gressette Felder Jr.
**McGOWAN, HOOD & FELDER, LLC**
1517 Hampton Street
Columbia, SC 29201-2924
jfelder@mcgowanhood.com

Isaac L. Diel
**SHARP McQUEEN**
135 Oak Street
Bonner Springs, KS 66012
dslawkc@aol.com

Mary G. Kirkpatrick
**KIRKPATRICK & GOLDSBOROUGH,
PLLC**
Lakewood Commons
1233 Shelburne Road, Suite E-1
South Burlington, VT 05401
mkirk@vtlawfirm.com

John C. Lemaster
**RYLEY CARLOCK & APPLEWHITE**
One North Central Avenue, Suite 1200
Phoenix, AZ 85004-4417
jlemaster@rcalaw.com

**INDIRECT PURCHASER PLAINTIFFS' CLASS ACTION COMPLAINT AGAINST MITSUBISHI ELECTRIC**

Joel A. Flom
**FLOM LAW OFFICE P.A.**
1703 32nd Avenue South
Fargo, ND 58103
Telephone: (701) 280-2300
Email: joel@jeffreislaw.com

Eric J. Pickar (epickar@bangsmccullen.com)
**BANGS, McCULLEN, BUTLER, FOYE &
SIMMONS, LLP**
333 West Boulevard, Suite 400
P.O. Box 2670
Rapid City, SD 57709-2670
Tel: (605) 343-1040

Frank Balint (fbalint@bffb.com)
Manfred Muecke (mmuecke@bffb.com)
**BONNETT, FAIRBOURN, FRIEDMAN &
BALINT, P.C.**
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012-3311
Tel: (602) 274-1100
Fax: (602) 274-1199

Shpetim Ademi
**ADEMI & O'REILLY, LLP**
3620 East Layton Ave.
Cudahy, WI 53110
Telephone: (414) 482-8000
Facsimile: (414) 482-8001
gademi@ademilaw.com

Paul Novak
**WEITZ AND LUXENBERG**
Chrysler House
719 Griswold, Suite 620
Detroit, MI 48226
Phone: (313) 800-4170
Fax: (646) 293-7992
pnovak@weitzlux.com

James Wyatt
**WYATT & BLAKE, LLP**
435 East Morehead Street
Charlotte, NC 28202-2609
Telephone: (704) 331-0767
Facsimile: (704) 331-0773
JWyatt@wyattlaw.net

Charles Slidders
Elizabeth McKenna
**MILBERG LLP**
One Pennsylvania Plaza
49th Floor
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

Jon V. Harper
**HARPER LAW LLC**
68 South Main Street, Suite 800
Salt Lake City, Utah 84101
Telephone: (801) 910-4357
E-mail: jharper@jonharperlaw.com

Christopher D. Jennings
**JOHNSON & VINES, PLLC**
2226 Cottondale Ln, #210
Little Rock, AR 72202
Telephone: (501) 777-7777
cjennings@johnsonvines.com

Christopher R. Best
**THE GATTI LAW FIRM**
1781 Liberty St.
Salem, OR 97302
Telephone: (503)363-3443
Facsimile: (503)371-2478

INDIRECT PURCHASER PLAINTIFFS' CLASS ACTION COMPLAINT AGAINST MITSUBISHI ELECTRIC

Susan Kupfer
**Glancy Prongay & Murray LLP**
1808 6th St
Berkeley, CA 94710-2003
Telephone: (415) 972-8160
Facsimile: (415) 972-8166
Email: skupfer@glancylaw.com

Terry Gross
Adam C. Belsky
**Gross & Belsky, P.C.**
201 Spear Street, Suite 1100
San Francisco, CA 94105
Telephone:  (415) 544-0200
Facsimile: (415) 544-0201
Email: terry@grossbelsky.com

**INDIRECT PURCHASER PLAINTIFFS' CLASS ACTION COMPLAINT AGAINST MITSUBISHI ELECTRIC**